IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
APRIL 22, 2008 Session

# THOMAS DAVID JORDAN v. BURLINGTON NORTHERN SANTA FE RAILROAD COMPANY, A Corporation, and NORFOLK SOUTHERN RAILWAY COMPANY, A Corporation

Direct Appeal from the Circuit Court for Shelby County
No. CT-004175-03     James F. Russell, Judge

---

No. W2007-00436-COA-R3-CV - Filed January 15, 2009

---

This is an appeal from a jury trial involving the Federal Employers' Liability Act.  A railroad employee was struck by a passing train belonging to another railroad.  The employee sued both railroads, bringing a FELA claim against the employer railroad, and a negligence claim against the other railroad.  The jury returned a verdict in the employee's favor against the employer railroad, finding that the employer railroad was 100 percent at fault.  The employee was awarded damages in the amount of $4 million.  We affirm in part and reverse in part.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J., and WALTER C. KURTZ, SR., J., joined.

Everett B. Gibson, S. Camille Reifers, Memphis, TN, for Appellant

Robert M. Frey, Jackson, MS; Christopher A. Keith, Birmingham, AL; Stephen R. Leffler, Memphis, TN, for Appellee, Thomas David Jordan

William C. Spencer, William C. Spencer, Jr., Memphis, TN, for Appellee BNSF Railway Company

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

Thomas David Jordan was an employee of Norfolk Southern Railway Company ("Norfolk Southern") for over thirty years.  On November 13, 2002, Mr. Jordan was working as the conductor on a train traveling from Sheffield, Alabama to Memphis, Tennessee.  The train arrived in South Memphis on a stretch of track called "Broadway."  Broadway consists of six tracks running parallel alongside each other, but owned by several different railway companies.  Mr. Jordan exited the Norfolk Southern train and began working on the ground uncoupling the Norfolk Southern train's locomotives from the lead car.  Mr. Jordan was required to perform some of his duties between the Norfolk Southern track and an immediately adjacent track owned by Burlington Northern and Santa Fe Railway Company ("Burlington Northern").  At approximately 7:40 p.m., Mr. Jordan was struck by a passing Burlington Northern train, suffering major injuries.

Mr. Jordan brought suit against Norfolk Southern and Burlington Northern on July 28, 2003.  Mr. Jordan sought damages in the amount of $2 million, but later the trial court allowed Mr. Jordan to increase his *ad damnum* clause to $4 million.  Mr. Jordan brought suit against Norfolk Southern pursuant to the Federal Employers' Liability Act, 45 U.S.C.A. § 51.[1]  He claimed that his injuries were caused by the negligence of Norfolk Southern's employees "or by reason of a defect or insufficiency due to the Defendant's negligence in its work practices, walk ways, safety practices, inspection practices, track clearance, operating practices, and trackage at the time and place where Plaintiff suffered his injuries."  Mr. Jordan specifically claimed that Norfolk Southern failed to provide him a reasonably safe place to work by requiring him to work on the ground between the two tracks, despite knowledge that the width between the two tracks did not allow sufficient clearance for employees.  Mr. Jordan's complaint also included a common law negligence claim against Burlington Northern.  He alleged that Burlington Northern allowed its train crews to operate its train at unsafe speeds and without proper warnings to individuals working in the area, despite knowledge that there was not sufficient track clearance between the two tracks.

Burlington Northern filed a cross-claim against Norfolk Southern, contending that Norfolk Southern was contractually obligated to indemnify Burlington Northern for "any and all liability, costs, expenses or attorney's fees arising out of Plaintiff's claims against [Burlington Northern] . . . ."  This cross-claim arose from a "Letter Agreement" between the parties, dated November 5, 1999, which provided for indemnification in specified circumstances.  Norfolk Southern filed a cross-claim against Burlington Northern, contending that Burlington Northern must indemnify it pursuant to the Letter Agreement.  Alternatively, Norfolk Southern argued that the Letter Agreement was not applicable to the accident in question.

---

[1]  45 U.S.C.A. § 51 provides, in relevant part:

> Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

Norfolk Southern and Burlington Northern both filed motions for summary judgment as to the cross-claims, contending that the other party was responsible for indemnification. On July 8, 2005, the trial court held a hearing on these motions, and on February 9, 2007, the court denied and dismissed the respective motions. The order of dismissal incorporated the court's oral ruling. The trial court concluded that "each party will be obligated under the terms of the agreement and the language . . . to defend its own self and pay its own damages and cost of defense as is contemplated according to this [agreement]. . . ."

Trial commenced on January 17, 2006. The jury heard testimony from twenty-three witnesses. Mr. Jordan testified, but he did not remember the accident due to amnesia. The last thing he remembered from the day of the accident was being called into work when he was at his home in Alabama. The next thing he remembered was being in the hospital's trauma center approximately eleven to twelve days later. Mr. Jordan had suffered a significant trauma to the back of his head, which resulted in a laceration to his scalp and loss of consciousness. Mr. Jordan also suffered fractures at three different levels of his spine, which required the removal of bone from his hip area to be fused to the vertebra, in addition to the insertion of a metal rod and screws. Mr. Jordan had a fracture of his left tibia and fibula, or shin bones. Two screws were inserted just below his left knee, and another two screws were inserted above his ankle. Mr. Jordan had a fracture of the left scapula, or shoulder blade. He had an open wound on his right upper thigh area and a minor fracture in the upper part of the femur in the right hip. Mr. Jordan also suffered a lacerated spleen and collapsed lung. Mr. Jordan awoke with horizontal double vision, which his opthalmologist testified was due to abnormal eye alignment.

Upon his release from the hospital, Mr. Jordan relied on his wife to dress him, bathe him, and otherwise care for him. At trial, Mr. Jordan testified that he still had problems with his left ankle, lower leg, and knee, along with discomfort in his hips, lower back and shoulder. His orthopaedic surgeon testified that Mr. Jordan had developed traumatic arthritis from his injuries, and he would, more likely than not, need to undergo knee replacement surgery. The orthopaedic surgeon described the screws in Mr. Jordan's knee as "prominent," meaning one could touch the skin and feel the screws. He said the screws would be "very irritating" underneath the skin. Mr. Jordan said he takes Celebrex everyday in addition to six to eight Tylenol per day. Mr. Jordan's orthopaedic surgeon testified that Mr. Jordan would need to take an anti-inflammatory drug for his back pain indefinitely, along with possible epidural injections. Mr. Jordan testified that his vision was still slightly impaired, despite the addition of a prism into his glasses.

At the time of trial, Mr. Jordan had not returned to work. Norfolk Southern had contacted Mr. Jordan and invited him to apply for a different position with the railroad, but Mr. Jordan claimed that it was a "relief" position in which Mr. Jordan would only be working a few days per month. Norfolk Southern had reimbursed Mr. Jordan for the cost of taking computer classes at a local community college, but he had not yet obtained a degree or secured employment. An economist testified that Mr. Jordan's net income loss to date totaled $183,456. The present value of his future lost wages was $471,176, and the present value of his lost health insurance benefits totaled $111,677.

These figures regarding future losses were calculated based upon the assumption that Mr. Jordan could not return to work. The economist also estimated that Mr. Jordan's future medical costs would total $61,550. In summary, he calculated Mr. Jordan's total economic losses at $827,859.

The engineer who was working with Mr. Jordan on the Norfolk Southern train testified about the nature of the six-track area of Broadway and the duties Mr. Jordan was required to perform on the ground in order to uncouple the locomotives. The engineer testified that there is no signal communication at Broadway, and the different railroads do not communicate with one another, so there was no way for him or Mr. Jordan to know that the Burlington Northern train was approaching on the night of the accident. In addition, Mr. Jordan was required to wear ear plugs and safety goggles while performing his duties. The engineer testified that the stationary Norfolk Southern locomotive was noisy, but the approaching Burlington Northern locomotive would not have been as noisy if it was idling. The Burlington Northern engineer testified that his locomotive was likely in idle mode at the time of the accident. Witnesses also testified that it is very dark at Broadway at night, yet it was normal practice for a passing train to dim its headlight as a courtesy as it approached another train. The Burlington Northern engineer testified that on the night of the accident, he dimmed his train's headlight as it rounded the curve and he saw the Norfolk Southern train. The Norfolk Southern engineer testified that the Burlington Northern train did not have its headlight turned on until after the accident.

The Norfolk Southern engineer testified that Mr. Jordan was required to be between the Norfolk Southern and Burlington Northern tracks in order perform some of his duties, and he described the track clearance between those tracks as "extremely close." He testified that when the Burlington Northern train stopped beside his train after the accident, he could reach his arm out the window of the Norfolk Southern locomotive and touch the Burlington Northern train. Another Norfolk Southern employee also testified that there was not sufficient clearance between the tracks at that particular location to safely perform the duties required of a conductor. He said trains could unexpectedly "be on you, you know, in a matter of seconds" because of a nearby curve in the track and the lack of communication with other railroads. The employee described one incident he experienced when working as a conductor on the ground at Broadway, stating, "a train eased up on me without me hearing it. And it was so close I had to squat down under the car in order to keep from getting hit." The employee testified that Norfolk Southern had instructed its employees to perform other on the ground duties, such as brake tests, at locations away from Broadway where there is wider track clearance.

The distance between the tracks, from centerline to centerline, in the area where Mr. Jordan was injured ranged from 12 feet, 5.125 inches to 12 feet, 8.625 inches.[2] Considering the width of

---

[2] Tennessee Code Annotated section 65-6-205 provides,

(a)      The minimum distance between the center lines of parallel standard gauge tracks shall be
         fourteen feet (14') except as provided in this section.
. . . .

(continued...)

the locomotives on the two tracks, the open space between the Burlington Northern train and the Norfolk Southern train, also called the "safe zone," was somewhere between 2 feet, 1.125 inches and 2 feet, 4.625 inches. However, the Norfolk Southern engineer testified that a train in motion would be rocking somewhat, which would lessen the clearance between the trains. The engineer stated that in his opinion, Mr. Jordan did not have sufficient room at that particular location of the track to perform the duties he was required to perform on the night of the accident.

Various other witnesses testified whose testimony need not be repeated here. At the close of the plaintiff's proof, Norfolk Southern moved the court to direct a verdict in its favor, claiming that because its tracks were in compliance with Tennessee Code Annotated section 65-6-205(d), it could not have been negligent, as a matter of law. Norfolk Southern contended that Mr. Jordan's claim under the Federal Employers' Liability Act was "preempted by the Tennessee clearance statutes since they are officially recognized by the [Federal Railroad Administration] as the appropriate standard." The trial court denied Norfolk Southern's motion. Norfolk Southern renewed the motion at the close of all the proof, but the motion was again denied.

The jury returned its verdict on February 9, 2006, finding no negligence on the part of Mr. Jordan or Burlington Northern, and apportioning each zero percent fault. The jury found that Norfolk Southern was negligent and one hundred percent at fault for Mr. Jordan's injuries. The jury awarded Mr. Jordan $5 million in damages, but in its order on the jury verdict, the trial court entered judgment against Norfolk Southern in the amount of $4 million in accordance with the *ad damnum* clause.

Norfolk Southern filed a motion for a new trial, which the court denied on January 31, 2007.

## II. ISSUES PRESENTED

Norfolk Southern raises the following issues on appeal, which we slightly reword:

1.  Whether the trial court erred in declining to direct a verdict in its favor because Mr. Jordan cannot recover as a matter of law under the Federal Employers' Liability Act due to Norfolk Southern's compliance with Tennessee Code Annotated section 65-6-205.
2.  Whether the trial court erred in instructing the jury concerning causation.
3.  Whether the jury award is excessive.
4.  Whether the trial court erred in refusing to grant a new trial because the verdict reflected passion, prejudice, or caprice, and whether the trial court should have granted Norfolk Southern's motion for mistrial made during the course of the trial.

---

[2](...continued)

    (d)      Tracks constructed prior to April 13, 1949, may be maintained at such clearance as was lawful at the time of construction.

The tracks at issue in this case were originally constructed in the 1800's.

5.	Whether the trial court erred in refusing to grant a new trial because the jury award is contrary to the weight of the evidence.

6.	Whether the trial court erred as a matter of law in interpreting the Letter Agreement.

Burlington Northern also raises the issue of whether the trial court incorrectly interpreted the Letter Agreement.

## III.  DISCUSSION

### A.  Norfolk Southern's Motion for Directed Verdict

On appeal, Norfolk Southern argues that it was entitled to judgment as a matter of law because Mr. Jordan cannot recover under the Federal Employers' Liability Act, 45 U.S.C.A. § 51, when Norfolk Southern complied with the applicable state standard for track clearances, Tennessee Code Annotated section 65-6-205, and the state statute is a permissible "gap filler" in the Federal Railroad Safety Act.  We begin with a brief discussion of the principles of preemption, then we will examine each of the federal Acts.

### 1.  Preemption

Article VI of the United States Constitution provides that laws of the United States made pursuant to the authority of the Constitution "shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  The Supremacy Clause of Article VI provides Congress with the power to preempt state law.  *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 368 (1986).  "The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law."  *Id.* at 369.  "Where a state statute conflicts with, or frustrates, federal law, the former must give way."  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) (citations omitted).  State laws that interfere with or are contrary to federal law are a nullity.  *Ill. Cent. Gulf R.R. Co. v. Tenn. Pub. Serv. Comm'n*, 736 S.W.2d 112, 114 (Tenn. Ct. App. 1987) (citing *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985)).

### 2.  The Federal Employers' Liability Act

"The impetus for the [Federal Employers' Liability Act ("FELA"), 45 U.S.C.A. §§ 51-60] was that throughout the 1870's, 80's, and 90's, thousands of railroad workers were being killed and tens of thousands were being maimed annually in what came to be increasingly seen as a national tragedy, if not a national scandal."  *CSX Transp., Inc. v. Miller*, 858 A.2d 1025, 1029 (Md. Ct. Spec. App. 2004).  "In response to mounting concern about the number and severity of railroad employees' injuries, Congress in 1908 enacted FELA to provide a compensation scheme for railroad workplace injuries, pre-empting state tort remedies."  *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 165 (2007) (citing *Second Employers' Liability Cases*, 223 U.S. 1, 53-55 (1912)).  FELA was passed to extend

statutory protection to railroad workers because of the high rate of injury to workers in that industry.[3] ***Blackburn v. CSX Transp., Inc.***, No. M2006-01352-COA-R10-CV, 2008 WL 2278497, at *8 (Tenn. Ct. App. May 30, 2008); ***Reed v. CSX Transp., Inc.***, No. M2004-02172-COA-R3-CV, 2006 WL 2771029, at *2 (Tenn. Ct. App. Sept. 26, 2006). "In adopting FELA, Congress created a remedy that 'shifted part of the human overhead of doing business from employees to their employers.'" ***Pomeroy v. Ill. Cent. R.R. Co.***, No. W2004-01238-COA-R3-CV, 2005 WL 1217590, at *9 (Tenn. Ct. App. May 19, 2005) (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994)). Congress recognized that the railroad industry was better able to shoulder the cost of industrial injuries and deaths than were injured workers or their families. ***Miller***, 858 A.2d at 131 (citing *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 431-32 (1958)). "[FELA] was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations." ***Pomeroy***, 2005 WL 1217590, at *17 (quoting *Wilkerson v. McCarthey*, 336 U.S. 53, 68 (1949)(Douglas, J., concurring)). The Federal Employers' Liability Act provides, in relevant part:

> Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C.A. § 51. The statute is broad and remedial, and it is to be liberally construed in order to accomplish the aforementioned purposes. ***Blackburn***, 2008 WL 2278497, at *8; ***Reed***, 2006 WL 2771029, at *2.

"Unlike a typical workers' compensation scheme, which provides relief without regard to fault, Section 1 of FELA provides a statutory cause of action sounding in negligence . . . ." ***Sorrell***, 549 U.S. at 165. Under FELA, the railroad-employer's liability is premised upon its negligence. ***Reed***, 2006 WL 2771029, at *2. In order to recover, an employee must show:

(1)    that an injury occurred while the employee was working within the scope of his employment;

(2)    that the employment was in the furtherance of the railroad's interstate transportation business;

(3)    that the employer railroad was negligent; and

(4)    that the employer's negligence played some part in causing the injury.

---

[3] "The very title of the law, Federal Employers' Liability Act, is confusingly overbroad." ***Miller***, 858 A.2d at 1029. It is not a "federal employer" law, but a federal law pertaining to railroads as employers. ***Id.*** "The only possible defendants are railroads engaged in interstate commerce. The only possible plaintiffs are the employees of those railroads who are injured on the job." ***Id.***

*Id.* (citing *Jennings v. Ill. Cent. R.R. Co.*, 993 S.W.2d 66, 69-70 (Tenn. Ct. App. 1998)). In this case, the question was whether Norfolk Southern was negligent in causing Mr. Jordan's injury. FELA does not define negligence. *Id.* When considering whether an employer was negligent under FELA, "courts are to analyze the elements necessary to establish a common law negligence claim." *Id.* (citing *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir. 1990); *Davis v. Burlington Northern, Inc.*, 541 F.2d 182 (8th Cir. 1976), *cert. denied*, 429 U.S. 1002 (1976)). The issue of negligence is to be determined "by the common law principles as established and applied in federal courts."[4] *Reed*, 2006 WL 2771029, at *2 (citations omitted). Thus, the plaintiff must prove the traditional elements of negligence: duty, breach, foreseeability, and causation. *Id.* (citing *Robert v. Consol. Rail Corp.*, 832 F.2d 3, 6 (1st Cir. 1987)). However, FELA deviated from the common law by abolishing the railroad's common law defenses of assumption of the risk, § 54, and it rejected contributory negligence in favor of comparative negligence, § 53. *Sorrell*, 549 U.S. at 166, 168. In FELA cases, an employee's negligence does not bar relief, but the employee's recovery is diminished in proportion to his fault. *Id.* at 166.

"Under FELA, the employer railroad has a duty to provide a reasonably safe workplace." *Reed*, 2006 WL 2771029, at *3 (citing *Bailey v. Cent. Vt. Ry.*, 319 U.S. 350, 352, 63 S. Ct. 1062, 1062 (1943); *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996); *Adams*, 899 F.2d at 539). This does not mean that the railroad has the duty to eliminate all workplace dangers, but it does have the "duty of exercising reasonable care to that end." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 269 (6th Cir. 2007) *cert. denied*, 129 S.Ct. 489 (2008) (citing *Baltimore & Ohio S.W.R. Co. v. Carroll*, 280 U.S. 491, 496 (1930)). "A railroad breaches its duty to its employees when it fails to use ordinary care under the circumstances or fails to do what a reasonably prudent person would have done under the circumstances to make the working environment safe." *Id.* (citing *Tiller v. Atl. C.L.R. Co.*, 318 U.S. 54, 67 (1943); *Aparicio v. Norfolk & W. Ry.*, 84 F.3d 803, 811 (6th Cir. 1990)). In other words, "a railroad breaches its duty when it knew, or by the exercise of due care should have known that prevalent standards of conduct were inadequate to protect the plaintiff and similarly situated employees." *Id.* at 269-70 (internal quotations omitted).

### 3. The Federal Railroad Safety Act

In 1970, Congress adopted the Federal Railroad Safety Act ("FRSA") in order "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C.A. § 20101. FRSA is "the primary source of legislation dealing with the various railroad safety problems." *Emery v. S. Ry. Co.*, 866 S.W.2d 557, 561 (Tenn. Ct. App. 1993) (quoting *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548 (11th Cir. 1991)). "The legislative history [of FRSA] indicates that Congress was wary of the role of the states in rail safety." *Id.* (quoting *Easterwood*, 933 F.2d at 1552-53). According to the House report, the committee feared that safety in the nation's railroads would not be sufficiently advanced by subjecting the national railroad

---

[4] "FELA provides for concurrent jurisdiction of the state and federal courts, § 56, although substantively FELA actions are governed by federal law." *Sorrell*, 549 U.S. at 165-66 (citing *Chesapeake & Ohio R. Co. v. Stapleton*, 279 U.S. 587, 590 (1929)); *see also Jennings v. Ill. Cent. R.R. Co.*, 993 S.W.2d 66, 70 (Tenn. Ct. App. 1998).

system to varying degrees of enforcement in fifty states. *Id.* at 561-62 (quoting *Easterwood*, 933 F.2d at 1552-53). "Congress determined that the only way to effectively regulate railroad safety was to establish a broad national scheme of railroad safety regulation, as opposed to the then existing patchwork system of federal and state regulations." ***Ill. Cent. Gulf R.R. Co. v. Tenn. Public Serv. Comm'n***, 736 S.W.2d 112, 115 (Tenn. Ct. App. 1987).

Under FRSA, the Secretary of Transportation is authorized to "prescribe regulations and issue orders for every area of railroad safety[.]" 49 U.S.C.A. § 20103(a). The Secretary of Transportation delegated that responsibility to the Federal Railroad Administration ("FRA"), which adopted "track safety standards" in 1971. ***Ill. Cent. Gulf R.R. Co.***, 736 S.W.2d at 115 (citing C.F.R. §§ 213.1-.241 (1985)). FRSA provides that "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable." 49 U.S.C.A. § 20106(a)(1). Thus, Congress expressly indicated an intent to preempt state law on the subject of railroad safety. ***Ill. Cent. Gulf R.R. Co.***, 736 S.W.2d at 115. However, it made an exception for two particular situations. One exception, not at issue in this case,[5] allows a state to adopt or continue in force an additional or more stringent railroad safety standard when necessary to eliminate or reduce an essentially local safety hazard, under certain circumstances. 49 U.S.C.A. § 20106(a)(2). The second exception to FRSA preemption is stated as follows:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.

49 U.S.C.A. § 20106(a)(2). In other words, state rules, regulations, or orders related to railroad safety are not preempted if the Secretary of Transportation, or the FRA, has not adopted a rule or regulation covering the same subject matter. ***Ill. Cent. Gulf R.R. Co.***, 736 S.W.2d at 115. In order to "cover" the same subject matter and preempt state law, the federal regulation must "substantially subsume the subject matter of the relevant state law," and not merely "touch upon" or "relate to" that subject matter. ***Norfolk S. Ry. Co. v. Shanklin***, 529 U.S. 344, 352 (2000).

If the FRA has adopted a rule or regulation that covers a subject, then any state "law, rule, regulation, order, or standard relating to railroad safety" that covers the same subject matter is preempted. 49 U.S.C.A. § 20106(a)(2). "Legal duties imposed on railroads by the common law fall within the scope of these broad phrases." ***Easterwood***, 507 U.S. at 664. Thus, "state tort law would be pre-empted also, regardless of whether it is common law based or statutorily based." ***Emery***, 866 S.W.2d at 560. For example, in ***Emery***, a plaintiff whose automobile was struck by a train sued the railroad for negligence, claiming that the train was traveling at an excessive and dangerous rate of

---

[5] The parties do not claim that the second exception applies. A broad general regulation drawn for statewide application cannot come within the second exception because it is not drawn to address a local condition. ***Ill. Cent. Gulf R.R. Co.***, 736 S.W.2d at 115.

speed. *Id.* at 558. However, the Secretary of Transportation had promulgated regulations pursuant to FRSA concerning train speeds, and the train was operating in compliance with that speed limit. *Id.* at 560-61. The plaintiff's tort claim based on excessive speed was therefore preempted by FRSA. *Id.* at 561. In *Illinois Central Gulf Railroad Co.*, however, a Tennessee regulation regarding railroad walkways was not preempted because the FRA had not issued a regulation covering the same subject matter. 736 S.W.2d at 116.

Relevant to this case, Tennessee has a statute which addresses minimum track clearance, or the distance between railroad tracks, codified at Tennessee Code Annotated section 65-6-205. It provides:

> (a) The minimum distance between the center lines of parallel standard gauge tracks shall be fourteen feet (14') except as provided in this section.
> (b) The center line of any standard gauge ladder track, constructed parallel to any other adjacent track, shall have a clearance of not less than eighteen feet (18') from the center line of such other track.
> (c) The minimum distance between the center lines of parallel team, house and industry tracks shall be thirteen feet (13').
> (d) Tracks constructed prior to April 13, 1949, may be maintained at such clearance as was lawful at the time of construction.

Tenn. Code Ann. § 65-6-205.[6]

Even if we assume that Tennessee's track clearance statute and its "grandfather clause" are "related to railroad safety," it is undisputed that no FRA regulation addresses track clearance. Therefore, Tennessee's track clearance statute is not preempted by FRSA. *See* 49 U.S.C.A. § 20106(a)(2) ("A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement."); *Ill. Cent. Gulf R.R. Co.*, 736 S.W.2d at 115 (explaining that FRSA does not preempt state standards where the Secretary of Transportation has not adopted a rule or regulation covering the same subject matter).

### 4. FRSA and FELA

As previously discussed, a federal regulation adopted pursuant to FRSA preempts any *state* "law, rule, regulation, order or standard relating to railroad safety" that covers the same subject matter as the federal regulation. 49 U.S.C.A. § 20106(a)(2). This includes state tort claims. *Easterwood*, 507 U.S. at 664; *Emery*, 866 S.W.2d at 561. Some courts have extended the reasoning

---

[6] The distance between the tracks at issue in this case was approximately twelve and a half feet, but the tracks were constructed before 1949. Thus, Norfolk Southern was not in violation of the state statute.

of the preemption analysis discussed above and held that *federal* negligence claims brought by railroad employees pursuant to FELA are "precluded" by FRSA regulations.

For example, in ***Waymire v. Norfolk & Western Railway Co.***, 218 F.3d 773, 774 (7th Cir. 2000), a train was involved in an accident with a truck at a railroad crossing. One of the railroad's employees claimed he was injured and sued the railroad, alleging that it was negligent in allowing the train to travel at an unsafe speed and in failing to install additional warning devices at the railroad crossing. *Id.* However, the train was traveling well below the speed limit set by FRSA regulations, and the crossing was equipped with warning devices that were installed and approved in accordance with FRSA regulations. *Id.* The Seventh Circuit concluded that "in order to uphold FRSA's goal of uniformity," the employee's FELA negligence claims should be superseded by the FRSA regulations. *Id.* at 776. Other courts have similarly held that railroad employees' federal negligence claims under FELA are precluded if the railroad complied with FRSA regulations. *See, e.g.*, ***Lane v. R.A. Sims, Jr., Inc.***, 241 F.3d 439, 443-44 (5th Cir. 2001); ***Dickerson v. Staten Trucking, Inc.***, 428 F.Supp.2d 909, 914 (E.D. Ark. 2006); ***In re: Amtrak "Sunset Limited" Train Crash in Bayou Canot, Ala., on Sept. 22, 1993***, 188 F.Supp.2d 1341, 1348-49 (S.D. Ala. 2000); ***Rice v. Cincinnati, New Orleans, & Pac. Ry. Co.***, 955 F.Supp. 739, 741 (E.D. Ky. 1997). Other courts have reached the opposite conclusion, holding that FELA claims are not preempted or precluded by FRSA regulations. *See, e.g.*, ***Earwood v. Norfolk S. Ry. Co.***, 845 F.Supp. 880, 885 (N.D. Ga. 1993) ("The Court concludes that Plaintiff's FELA claims are not precluded by FRSA. The two statutes do not purport to cover the same areas. . . . Neither the FRSA nor the regulations purport to define the standard of care with which railroads must act with regard to employees."); ***Myers v. Ill. Cent. R.R. Co.***, 753 N.E.2d 560, 565 (Ill. App. Ct. 2001) ("If Congress had intended FRSA to abolish FELA remedies for railroad employees, we believe Congress would have said so explicitly."). Thus, ***Waymire***'s holding that FELA negligence claims can be precluded when a railroad is in compliance with FRSA regulations is by no means universally adopted. *See* Joseph Mark Miller, *Federal Preemption & Preclusion: Why the Federal Railroad Safety Act Should Not Preclude the Federal Employer's Liability Act*, 51 Loy. L. Rev. 947 (Winter 2005) (discussing cases).

### 5. Norfolk Southern's Arguments

On appeal, Norfolk Southern argues that because the Tennessee track clearance statute is *not preempted* by FRSA, it effectively became a part of FRSA. Norfolk Southern further argues that the Tennessee statute, as part of FRSA, established the standard of care for the railroad as a matter of law and precludes Mr. Jordan's FELA claim. We reject these arguments.

Norfolk Southern relies exclusively on ***Tyrrell v. Norfolk Southern Railway Co.***, 248 F.3d 517 (6th Cir. 2001), for its argument that the Tennessee track clearance statute became part of FRSA. In that case, the Sixth Circuit was faced with an issue similar to the one before us. The plaintiff railroad employee was injured when he was walking between two tracks, and a railroad car traveling on one of the tracks struck him. *Id.* at 520. The employee sued the railroad for negligence under FELA, claiming that the railroad failed to provide a reasonably safe place to work by using an unreasonably dangerous track clearance in violation of state law. *Id.* Ohio's track clearance

-11-

regulation required at least 14 feet of clearance between the centers of tracks, and the track clearance where the employee was injured was 13 feet, 9 inches, in violation of the regulation.[7] *Id.* The defendant railroad claimed that the state track clearance regulation was preempted. *Id.* The Sixth Circuit found, as we noted earlier in this opinion, that the "FRA has no rail safety regulation that substantially subsumes the subject of track clearances," therefore, the Ohio track clearance regulation was not preempted. *Id.* at 525. In closing, the Court reiterated that because no FRA regulation covered the subject matter of track clearance, the Ohio regulation was "a permissible gap filler in the federal rail safety scheme," citing 49 U.S.C.A. § 20106. *Id.*

Norfolk Southern interprets the *Tyrrell* Court's statement to mean that a state regulation, if not preempted by a FRSA regulation, becomes "incorporated into the federal rail safety scheme as a permissible 'gap filler,'" and, as part of FRSA, the Tennessee statute precludes Mr. Jordan's FELA claim. We need not decide whether a FELA claim can be precluded by a FRSA regulation, because, in this case, there is no FRSA regulation at issue. We believe that Norfolk Southern's reading of *Tyrrell* goes too far. In *Tyrrell*, the Sixth Circuit simply found that the state regulation at issue was not preempted pursuant to 49 U.S.C.A. § 20106, which states, "A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement." Under FRSA, the Secretary of Transportation is authorized to "prescribe regulations and issue orders for every area of railroad safety[.]" 49 U.S.C.A. § 20103(a). Norfolk Southern has cited no authority for the notion that a state statute regarding railroad safety, if not preempted, becomes part of FRSA in the sense that the state statute is to be treated as if it were an actual FRSA regulation. This certainly would not serve FRSA's stated goal of achieving nationally uniform laws and regulations. *See* 49 U.S.C.A. § 20106(a)(1).

In *Johnson v. Union Pacific R.R. Co.*, No. 8:05CV373, 2007 WL 2914886, at *2 (D. Neb. Oct. 4, 2007), a defendant railroad similarly claimed that the plaintiff in a FELA case should be prohibited from arguing that the railroad's track clearance was "too close" because the railroad was in compliance with all Nebraska track clearance regulations. The Court noted that all the cases cited by the railroad in support of its position involved the preemptive force of regulations adopted pursuant to FRSA. *Id.* at *2. As is the case here, neither party had cited a case addressing whether state regulations can define the per se standard of care owed by a railroad under FELA. *Id.* The District Court ultimately concluded that "complying with the Nebraska track clearance regulations cannot be interpreted as setting the standard of care owed under the FELA," because the federal act superseded state law. *Id.* We agree with the District Court's reasoning.

In conclusion, we find that the trial court properly denied Norfolk Southern's motion for directed verdict, in which it argued that Mr. Jordan's FELA claim was precluded based on Norfolk Southern's compliance with the Tennessee statute.

---

[7] Here, Norfolk Southern was not in violation of the state statute regarding track clearance because of its "grandfather clause."

### B. Jury Instructions Regarding Causation

Next, Norfolk Southern argues that the jury instruction given by the trial court stated an incorrect causation standard. Norfolk Southern submitted the following Request for Instruction Number One regarding proximate causation:

> If you find that the railroad was negligent, you must next determine whether the railroad's negligence caused the plaintiff's injury in whole or in part. You need not find that the railroad's negligence was the sole cause, but you must find that it was a proximate cause of the plaintiff's injury. In order to find that it was a proximate cause, you must find that the injury was the natural and probable consequence of the railroad's negligence, and that the railroad's negligence was a substantial factor in bringing about the injury.
>
> You may not find that the railroad's negligence was a proximate cause if it merely created an incidental condition or situation in which an accident, otherwise caused, resulted in the plaintiff's injury.

The trial judge rejected the proposed instruction, stating, "in my humble view, the Defendant's Request Number One is adequately covered by the instructions that are given . . . ."

"Jury instructions must be correct and fair as a whole, although they do not have to be perfect in every detail." *Pomeroy*, 2005 WL 1217590, at *3 (citing *Wielgus v. Dover Indus.*, 39 S.W.3d 124, 131 (Tenn. Ct. App. 2001)). Jury instructions must be plain and understandable, and inform the jury of each applicable legal principle. *Id.* On appeal, we review jury instructions in their entirety and in context of the entire charge. *Id.* We will not invalidate a jury charge if, when read as a whole, it fairly defines the legal issues in the case and does not mislead the jury. ***Hensley v. CSX Transp., Inc.***, No. E2007-00323-COA-R3-CV, 2008 WL 683755, at *2 (Tenn. Ct. App. Mar. 14, 2008) *perm. app. denied* (Tenn. Nov. 17, 2008). "The trial court should give requested special jury instructions when they are a correct statement of the law, embody the party's legal theory, and are supported by the proof." *Pomeroy*, 2005 WL 1217590, at *3 (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 445 (Tenn. 1992)). "However, the trial court may decline to give a special instruction when the substance of the instruction is covered in the general charge." *Id.* We will not reverse the denial of a special request for an additional jury instruction where the trial court fully and fairly charged the jury on the applicable law. *Id.*

The trial court's instructions to the jury were lengthy and detailed, exceeding twenty-five pages, but some of the most relevant instructions concerning this issue are as follows:

> It is the further theory and contention of the Plaintiff that both defendants were at fault and that their combined fault was the legal cause of the accident . . . .
> . . . .
> . . . [I]t is the theory and contention of each Defendant that if either of them should be at fault, which they deny, then the Plaintiff himself was at fault and that his fault was the sole, direct, proximate and legal cause of the accident . . . .

. . . .

. . . I will first give you instructions dealing with general principles of law that apply equally to all parties.

. . . .

A party is at fault if you find by a preponderance of the evidence that the party was negligent <u>and</u> that the negligence was a legal cause of the injury or damage for which a claim is made.

Fault, as defined, has two parts: Negligence and legal cause. Negligence is the failure to use ordinary or reasonable care. . . . Negligence will not be inferred from the mere happening of an accident or occurrence of injury. . . .

The second part of fault is legal cause. A legal cause of an injury is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred.

An act or omission which fails to prevent injury is a legal cause of the injury. There may be more than one legal cause of an injury.

To be a legal cause of an injury, there is no requirement that it be the only cause, the last act, or the one nearest to the injury, so long as it is a factor in producing the injury or damage.

The foreseeability requirement does not require the person guilty of negligence foresee the exact manner in which the injury takes place or the exact person who would be injured. It is enough that the person guilty of negligence could foresee, or through the exercise of reasonable care should have foreseen, the general manner in which the injury or damage occurred.

If you find, by a preponderance of the evidence, that a party was negligent and that the negligence was a legal cause of the injury or damage for which a claim was made, you have found that party to be at fault. As I said before the plaintiff has the burden to prove fault on behalf of the defendants. . . .

## LAW AS RELATES TO NORFOLK SOUTHERN RAILWAY COMPANY AS EMPLOYER OF THOMAS DAVID JORDAN, EMPLOYEE

. . . .

Please remember, all of my earlier instructions regarding fault of the parties including negligence and legal cause apply to this Defendant.

. . . .

. . . The rights, duties and obligations between plaintiff employee and employer Norfolk Southern Railway Company in this case are based upon a law of the United States commonly called the Federal Employers' Liability Act. This title does not mean that every employer is liable to every employee for every injury. . . .

. . . .

Section 1 of the Federal Employers' Liability Act as set forth in 45 U.S.C.A. § 51 . . . provides in part that: "Every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . .

-14-

for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier."

. . . .

This is a negligence action. This means that before plaintiff can recover he must prove that his injury resulted in whole or in part from the negligence or fault of this defendant.

A railroad is not an insurer of the safety of its employees, and negligence on the part of the railroad may not be presumed or inferred from mere proof of the happening of an accident.

No liability may be imposed upon the railroad unless the evidence disclosed (1) that it failed to exercise reasonable care under the circumstances, and (2) that any such failure in whole or in part legally caused the injuries of the plaintiff. As I said before, the burden is upon the plaintiff to prove both of the foregoing elements of his case by a preponderance of the evidence.

. . . [I]n order to recover plaintiff is required to prove by a preponderance of the evidence that the defendant through its agents, servants or employees was guilty of negligence, which, in whole or in part, legally caused the accident and injury. . . .

The [FELA] also provides that . . . [an] employee shall not be held to assume any risk of his employment in any case where such injury resulted in whole or in part from the negligence of the railroad. If you find that the Defendant, Norfolk Southern Railway Company was negligent and that such negligence was a legal cause of injury sustained by the Plaintiff, then even if the Plaintiff may have continued work though he knew of the unsafe nature of the dangers existing, Plaintiff is entitled to recover damages.

. . . .

The law under which plaintiff brings this action provides that defendant shall be liable for injury resulting "by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, tracks, roadbeds, works, . . . or other equipment." This statutory provision does not mean that the railroad employer is responsible for injury of an employee merely because it was caused by some defect or insufficiency of one of the items referred to. To the contrary, the statute imposes liability on the railroad employer only when the defect or insufficiency is due to negligence, even the slightest, on the part of the employer. If there is an injury as the result of some defect or insufficiency, you must decide the extent to which such defect or insufficiency was due to negligence, even the slightest, on the part of the railroad.

. . . .

It was the continuing duty of the plaintiff to exercise reasonable and ordinary care for his own safety and protection. . . . If you find that he did not exercise such care as a reasonably prudent person would under like circumstances, and that such conduct contributed, in whole or in part, to the plaintiff's injury, then he is negligent.

-15-

On appeal, Norfolk Southern contends that FELA's standard of causation requires a plaintiff to prove that the railroad's negligence was "the proximate cause in whole or in part" of the employee's injury. Norfolk Southern claims that the trial court should have instructed the jury that in order for negligence to constitute a proximate cause of an injury, "it must appear that the injury was the natural and probable consequence of the negligence or wrongful act." We find that the substance of these proposed instructions was covered in the trial court's instructions. Although the trial court's jury instruction did not use the term "proximate" cause, the court repeatedly emphasized that the plaintiff must prove that the railroad's negligence "in whole or in part, legally caused" the injury. The trial court instructed the jury that "[a] legal cause of an injury is a cause which, in natural and continuous sequence, produces the injury, and without which the injury would not have occurred." The trial court in *Pomeroy v. Illinois Central Railroad Co.*, No. W2004-01238-COA-R3-CV, 2005 WL 1217590, at *2 (Tenn. Ct. App. May 19, 2005), also a FELA case, used this exact definition of legal cause in its jury instructions, although it did not use the term "proximate" cause. On appeal, the railroad-employer argued that the trial court's jury instructions "failed to convey that Mr. Pomeroy could recover only if the jury found Illinois Central to be negligent and also found that such negligence proximately caused Mr. Pomeroy's injuries." *Id.* at *8. We rejected the railroad's argument, finding that the instructions "emphasized that Mr. Pomeroy bore the burden of proving that Illinois Central was negligent and that such negligence was the proximate cause of his injury." *Id.* at *9. We also stated that the jury instructions, as a whole,[8] were "clear, detailed, and accurate regarding the applicable law and theories of the parties in this case." *Id.* at *6.

Next, Norfolk Southern argues that the court should have instructed the jury that, under FELA, a railroad's conduct is not a proximate cause of an accident if it "merely created an incidental condition or situation in which the accident, otherwise caused, results in such injury." However, the trial court instructed the jury that "[a] railroad is not an insurer of the safety of its employees, and negligence on the part of the railroad may not be presumed or inferred from mere proof of the happening of an accident." The trial court also explained that a railroad is not responsible for an employee's injury "merely because it was caused by some defect or insufficiency" in the railroad's cars, engines, tracks, roadbeds, etc. "To the contrary," the court explained, "the statute imposes liability on the railroad employer only when the defect or insufficiency is due to negligence, even the slightest, on the part of the employer." The court further instructed the jury, "If there is an injury as the result of some defect or insufficiency, you must decide the extent to which such defect or insufficiency was due to negligence, even the slightest, on the part of the railroad." On appeal, Norfolk Southern claims that the use of the phrase "even the slightest" was erroneous, citing a concurring opinion in *Norfolk Southern Railway Co. v. Sorrell*, 549 U.S. 158 (2007). In *Sorrell*, the United States Supreme Court reviewed a Missouri pattern jury instruction that applied different standards of causation to railroad negligence and employee contributory negligence under FELA. *Id.* at 161. The jury was instructed to find an employee contributorily negligent if his negligence "directly contributed to cause" the injury, but the jury could find the railroad negligent if its

---

[8] The jury instructions in *Pomeroy* were nearly identical to those used in this case, and most of the paragraphs are exactly the same. The same trial judge presided in both cases, and in this case, the judge stated that he was using the same instructions he used in *Pomeroy*.

negligence contributed "in whole or in part" to the injury. *Id.* The railroad objected to the instruction on the ground that it provided different standards of causation with respect to each party. *Id.* Regarding this issue, the Supreme Court held that "the causation standard under FELA should be the same for both categories of negligence." *Id.* at 160. Before the Supreme Court, the railroad "attempted to expand the question presented to encompass *what* the standard of causation under FELA should be, not simply whether the standard should be the same[.]" *Id.* at 163. The railroad claimed that there is a "deep conflict of authority" as to whether a "less onerous" proximate cause standard applies in FELA cases, based on the Supreme Court's prior statement in *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 506 (1957), that

> Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.[9]

Based on this split of authority, the railroad, in *Sorrell*, sought a ruling that "the standard should be proximate cause across the board." *Id.* at 165. Nevertheless, the majority of the Supreme Court declined to address the issue of "what standard applies as anterior to the question whether the standards may differ." *Id.* The Court limited its review to whether the court below erred in applying standards that differ. *Id.*

Two concurring opinions in *Sorrell* did address the issue of "what standard applies" to causation in FELA cases, but the authoring Justices disagreed as to the correct standard. Justice Souter's concurring opinion states,

> Despite some courts' views to the contrary, *Rogers* did not address, much less alter, existing law governing the degree of causation necessary for redressing negligence as the cause of negligently inflicted harm . . . .
>
> Prior to FELA, it was clear common law that a plaintiff had to prove that a defendant's negligence caused his injury proximately, not indirectly or remotely. . . .
>
> True, I would have to stipulate that clarity was not well served by the statement in Rogers that a case must go to a jury where "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." But that statement

---

[9] The Supreme Court had subsequently characterized *Rogers* as establishing a "relaxed" causation standard in FELA cases:

> [W]e held in *Rogers* [] that a relaxed standard of causation applies under FELA. We stated that "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."

*Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) (citations omitted).

did not address and should not be read as affecting the necessary directness of cognizable causation, as distinct from the occasional multiplicity of causations. It spoke to apportioning liability among parties, each of whom was understood to have had some hand in causing damage directly enough to be what the law traditionally called a proximate cause.

*Id.* at 173-75 (footnote and citations omitted) (Souter, J., concurring).  However, Justice Ginsburg disagreed with this reading of *Rogers*, stating in her concurrence that

> *Rogers* describes the test for proximate causation applicable in FELA suits.  That test is whether "employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."
> . . . .
> If we take up Prosser and Keeton's suggestion to substitute [the phrase] "legal cause" for "proximate cause," we can state more clearly what *Rogers* held: Whenever a railroad's negligence is the slightest cause of the plaintiff's injury, it is a legal cause, for which the railroad is properly held responsible.

*Id.* at 178-80 (footnote and citations omitted) (Ginsburg, J., concurring).

In this case, Norfolk Southern does not contend that the trial court applied different standards of causation to the parties,[10] which is the issue addressed by the majority in **Sorrell**.  Norfolk Southern claims that the trial court gave an "incorrect causation standard" by instructing the jury that "the statute imposes liability on the railroad employer only when the defect or insufficiency is due to negligence, even the slightest, on the part of the employer," and further stating, "If there is an injury as the result of some defect or insufficiency, you must decide the extent to which such defect or insufficiency was due to negligence, even the slightest, on the part of the railroad."  In **Pomeroy**, 2005 WL 1217590, at *7-9, the trial court used this same jury instruction, and we held that the jury was properly instructed regarding causation.  As stated above, there is a split of authority regarding the Supreme Court's use of the phrase "even the slightest" in *Rogers*,[11] and we decline to hold that

---

[10] The jury was instructed to determine that Mr. Jordan was negligent if it found that he failed to exercise reasonable and ordinary care, and that conduct "contributed, in whole or in part, to [his] injury."  The jury was also instructed that before Mr. Jordan could recover from Norfolk Southern, he was required to prove that his injury "resulted in whole or in part from the negligence or fault of [Norfolk Southern]."  The trial court stated that its instruction regarding legal cause "appl[ied] equally to all parties."

[11] The Sixth Circuit stated in *Tyree v. New York Central Railroad Co.*, 382 F.2d 524, 529 (6th Cir. 1967) *cert. denied*, 389 U.S. 1014(1967),

> [I]t would be better in [FELA] cases if no mention of proximate cause whatever was made to the jury and, following the views of the Supreme Court as expressed in *Rogers v. Missouri Pacific R. Co.*, . . . that the jury be instructed on the subject of causation to the effect that if employer negligence played any part, even the slightest, in producing the injury, the employer is liable in damages, and that if the employee's negligence contributed in part to the injury, the negligence of the employer and employee be compared, and the amount of recovery be diminished in proportion to the amount of the employee's negligence. This would remove the troublesome phrase of proximate cause from [FELA]

(continued...)

the trial court's instruction was improper based upon one of two conflicting concurring opinions in *Sorrell*. Other courts considering the issue in light of the concurring opinions in *Sorrell* have reached the same result. *See, e.g.*, **Montgomery v. CSX Transp., Inc.**, 656 S.E.2d 20, 28, n.6 (S.C. 2008) ("Although Justice Souter's concurring opinion in *Sorrell* has now clouded the issue on whether *Rogers* indeed relaxed the causation standard, the majority opinion did not speak to this precise issue. We therefore agree with Justice Ginsburg's assessment that *Sorrell* leaves both *Rogers* and *Gottshall* intact."); **CSX Transp., Inc. v. Begley**, No. 2007-CA-001380-MR, 2008 WL 3165840, at *3 (Ky. Ct. App. Aug. 8, 2008) ("CSX argues that the trial court erred by refusing to give the jury a proximate cause instruction. . . . In *Hamilton* [*v. CSX Transp., Inc.*, 208 S.W.3d 272, 278 (Ky. Ct. App. 2006)], a panel of this Court acknowledged that the United States Supreme Court's decision in *Rogers*, . . . "depart[ed] from traditional common-law tests of proximate causation." CSX urges us to revisit our decision in *Hamilton*, . . . pursuant to the concurring opinion in a recent United States Supreme Court decision, *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158 (2007). However, we are not persuaded by CSX's reliance on the concurring opinion in *Sorrell.* Consequently, we decline to revisit *Hamilton*, and we conclude the trial court properly denied CSX's requested instruction on proximate causation."); **Medwig v. Long Island R.R.**, No. 06 Civ. 2568(FM), 2007 WL 1659201, at *3 (S.D.N.Y. June 6, 2007) ("[T]he concurring opinion clearly does not establish that a majority of the Justices would be willing to revisit – much less overturn – *Rogers* if the opportunity arose. Indeed, in her own concurrence, Justice Ginsburg concludes the opposite: that the majority opinion 'leaves in place precedent solidly establishing that the causation standard in FELA actions is more 'relaxed' than in tort litigation generally.' . . . There consequently is no reason for this court to conclude, as the [railroad] urges, that the legal principles applicable to a railroad worker's FELA claim have changed.").

Norfolk Southern points to one other substantive difference between the trial court's jury instruction and the one proposed by Norfolk Southern: Norfolk Southern's proposed instruction stated, "In order to find that it was a proximate cause, you must find . . . that the railroad's negligence was a substantial factor in bringing about the injury." The trial court's instruction did not include the "substantial factor" language. On appeal, Norfolk Southern cites one case in support of its proposed instruction's "substantial factor" language – **Gallick v. Baltimore & Ohio R.R.**, 372 U.S. 108, 120, n.8 (1963). **Gallick** was a FELA case involving a railroad employee who was bitten by an insect. *Id.* at 109. Along the railroad's roadbed, "there had been for many years a pool of stagnant water, in and about which were dead and decayed rats and pigeons, or portions thereof," and "[i]nsects had been seen on, over, and about this stagnant pool." *Id.* While the railroad employee was working near the pool, he experienced a bite on his left leg just above the knee. *Id.* The wound subsequently became infected, and the infection failed to respond to medical treatment. *Id.* It worsened progressively until it spread throughout the employee's body, eventually necessitating the amputation of both his legs. *Id.* A jury entered judgment for the employee, but an appellate court

---

[11](...continued)
cases.

subsequently reversed, finding that the trial court should have entered a directed verdict for the employer. *Id.* at 112. Before the United States Supreme Court, the railroad argued that the injury was not reasonably foreseeable. *Id.* at 117. The Supreme Court rejected this argument, stating

> It is widely held that for a defendant to be liable for consequential damages he need not foresee the particular consequences of his negligent acts: assuming the existence of a threshold tort against the person, then whatever damages flow from it are recoverable. And we have no doubt that under a statute where the tortfeasor is liable for death or injuries in producing which his "negligence played any part, even the slightest" (*Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493) such a tortfeasor must compensate his victim for even the improbable or unexpectedly severe consequences of his wrongful act.

*Id.* at 120-21 (citations omitted). In a footnote, the Court further explained, "If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable." *Id.* at 121, n.8 (citing Restatement, Torts, § 435). *Gallick* did not involve the "substantial factor" language in the context of a jury instruction, and we believe that Norfolk Southern's proposed jury instruction containing such language was erroneous and properly rejected by the trial court. In *Denton v. Southern Railway Co.*, 854 S.W.2d 885, 888 (Tenn. Ct. App. 1993), the trial court instructed the jury in a FELA case that the railroad was liable to its employee only to the extent that its negligence was a "substantial contributing factor" to the employee's injuries. The Court of Appeals held that this instruction constituted reversible error in light of the fact that, in FELA cases, "the employee's burden to prove causation is slight." *Id.* Similarly, in *Hamilton v. CSX Transp., Inc.*, 208 S.W.3d 272, 275 (Ky. Ct. App. 2006), a trial court submitted an interrogatory to the jury which asked whether the railroad was negligent, and if so, whether that negligence was "a substantial cause" of the employee's injuries. The Kentucky Court of Appeals held that this was "a fundamentally incorrect statement of the law of causation in FELA cases." *Id.* at 277; *see also Narusiewicz v. Burlington N. R.R. Co.*, 391 N.W.2d 895, 899 (Minn. Ct. App. 1986) ("The FELA standard dispenses with the 'substantial factor' requirement of proximate cause[.]"); *McKillip v. Union Pac. R.R. Co.*, 525 P.2d 842, 844 (Wash. Ct. App. 1974) ("The negligence of the employer need not be even a substantial cause of the ensuing injury."); *Snyder v. Chicago, Rock Island & Pac. R.R. Co.*, 521 S.W.2d 161, 165 (Mo. Ct. App. 1973) (stating that the rule in conventional negligence cases, that the conduct causing harm to another must be "a substantial factor" in bringing about the injury, does not apply in FELA cases); *Parker v. Atchison, Topeka & Santa Fe Ry. Co.*, 263 Cal.App.2d 675, 678, 70 Cal.Rptr. 8, 10 (Cal. Ct. App. 1968) ("The negligence of the employer need not be the sole cause or even a substantial cause of the ensuing injury.").

Having reviewed the trial court's jury instruction in its entirety, we conclude that the court fully and fairly charged the jury on the applicable law. Thus, we find no error in the trial court's refusal to give Norfolk Southern's proposed jury instruction.

### C. Was the Jury Verdict Excessive?

Next, Norfolk Southern contends that the trial court should have granted its motion for new trial because the jury verdict and the judgment entered on the verdict are excessive. Norfolk Southern notes that "the greatest figure offered by Plaintiff related to economic loss was $827,859," while Mr. Jordan points out that the ratio between his non-economic damages and economic loss was less than 4:1.

Federal law provides the standard for determining whether to grant a new trial in a FELA case tried in state court.[12] *Blackburn v. CSX Transp., Inc.*, No. M2006-01352-COA-R10-CV, 2008 WL 2278497, at \*16 (Tenn. Ct. App. May 30, 2008). The United States Supreme Court has repeatedly emphasized "the preeminence of jury decisions in FELA matters and that any interference with a jury determination must be made pursuant to uniform federal laws." *Id.* at \*11 (citing *Brady v. S. Ry. Co.*, 320 U.S. 476 (1943), *Lavender v. Kurn*, 327 U.S. 645 (1946), *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500 (1957)). Thus, in order to grant a new trial in a FELA case tried in state court, the trial court must apply the federal standard and find that the verdict is against the "clear weight" of the evidence. *Id.* at \*16. The question of whether a jury verdict is excessive is "resolved by the discretionary consideration of the trial judge." *Cutter v. Cincinnati Union Terminal Co.*, 361 F.2d 637, 639 (6th Cir. 1966) (citing *Cordle v. Allied Chem. Corp.*, 309 F.2d 821, 826 (6th Cir. 1962); *S. Ry. Co. v. Miller*, 285 F.2d 202, 206 (6th Cir. 1960); *Consumers Power Co. v. Nash*, 164 F.2d 657, 660 (6th Cir. 1947)). "Absent clear abuse of discretion, appellate courts will not make their own appraisals." *Id.* (citing *Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 446 (8th Cir. 1961); *Agnew v. Cox*, 254 F.2d 263, 268 (8th Cir. 1958); *Nat'l Alfalfa Dehydrating & Mill Co. v. Sorenson*, 220 F.2d 858, 861 (8th Cir. 1955); *Sebring Trucking v. White*, 187 F.2d 486 (6th Cir. 1951)). In a FELA case, a "verdict with judgment thereon generally will not be disturbed on grounds of excessiveness unless it clearly appears to be unsupported by the evidence." *Palmer v. Norfolk S. Ry. Co.*, No. 03A01-9309-CV-00313, 1994 WL 111037, at \*5 (Tenn. Ct. App. E.S. Mar. 30, 1994) *perm. app. denied* (Tenn. Aug. 22, 1994) (citing *Knight v. Texaco, Inc.*, 786 F.2d 1296 (5th Cir. 1986); *Metcalf v. Atchison T. & S.F. Ry. Co.*, 491 F.2d 892 (10th Cir. 1974)). "[T]he issue of adequate compensation for personal injuries must involve more than a difference of opinion; but where the verdict is at variance with the dictates of experience and common sense, the court should not hesitate to say so." *Id.* (citing *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565 (2nd Cir.

---

[12] Although the Middle Section of this Court in *Blackburn* was specifically faced with the narrow issue of a challenge to the sufficiency of the evidence in the context of a motion for new trial, it noted that the United States Supreme Court cases it discussed stood for "a more expansive holding that goes well beyond our narrow issue." 2008 WL 2278497, at \*11. The Court approvingly cited *Head v. CSX Transportation, Inc.*, 524 S.E.2d 215 (Ga. 1999), and *Seaboard System Railroad, Inc. v. Taylor*, 338 S.E.2d 23 (Ga. Ct. App. 1985), for the notion that federal law also governs the issue of whether a jury's award of damages is excessive in FELA cases. *See also Palmer v. Norfolk S. Ry. Co.*, No. 03A01-9309-CV-00313, 1994 WL 111037, at \*5 (Tenn. Ct. App. E.S. Mar. 30, 1994) *perm. app. denied* (Tenn. Aug. 22, 1994) ("The measure of damages in suits under the FELA is determined by federal law."). The Middle Section's *Blackburn* opinion is thorough and well-reasoned, and we agree with the Court's conclusion that federal law provides the proper standard for determining whether to grant a new trial in a FELA case.

1988); *Paturzo v. Metro-North Commuter R.R.*, 751 F.Supp. 1086 (S.D.N.Y. 1990); *Cunningham v. Penn. Ry. Co.*, 55 F.Supp. 1012 (D.C.N.Y. 1944)). "A court can overturn a jury verdict if it is so outrageous as to shock the conscience and there is no reasonable basis for its size." **Musleh v. Am. S.S. Co.**, 878 F.2d 382 (Table), 1989 WL 68028, at *3 (6th Cir. 1989) (citing *Rodgers v. Fisher Body Div., G.M.C.*, 739 F.2d 1102, 1106 (6th Cir. 1984)).

The **Palmer** Court held that the trial court should have granted the defendant railroad's motion for new trial when the jury awarded the plaintiff employee $275,000 for a knee injury. 1994 WL 111037, at *4. The Court described the award as "clearly excessive, even for FELA cases"[13] and said the award was "shocking to the conscience" for an "essentially mild injury." *Id.* The plaintiff in that case had twisted his knee, but he did not seek medical attention or miss work until eight months after the injury, when he underwent arthroscopic surgery. *Id.* The plaintiff's physician testified that there would be no further significant medical problems attributed to the knee injury, although the plaintiff may have "mild and occasional" pain. *Id.*

More recently, in **Pomeroy v. Illinois Cent. R.R. Co.**, No. W2004-01238-COA-R3-CV, 2005 WL 1217590, at *19 (Tenn. Ct. App. May 19, 2005), this Court addressed "the difficulty inherent in determining whether damages awarded largely in compensation for pain and suffering in an action brought under FELA are [excessive]." We explained that "[b]ecause pain and suffering are not easily quantified and do not lend themselves to easy valuations, . . . the determination of whether such an award is excessive is somewhat subjective." *Id.* (citing *Hand v. Norfolk So. Ry. Co.*, No. 03A01-9704-CV-00123, 1998 WL 281946, at *11 (Tenn. Ct. App. June 2, 1998) *perm. app. denied* (Tenn. Nov. 2, 1988)). In **Pomeroy**, the plaintiff employee suffered injuries to his back when he fell from a railcar that derailed. *Id.* at *1. The jury awarded him $500,000, although he only incurred $41,527 in special damages, including past and future lost wages and medical bills. *Id.* at *19. The employee did not undergo surgery and was able to return to work six weeks after the accident. *Id.* He was able to perform all daily activities, but due to his spinal injury, he continued to experience "unrelenting pain" on a daily basis and was unsure of whether he would be able to continue working until age 65. *Id.* Although we found the award "high," we were unable to say that the award was "excessive or unreasonable." *Id.*

On appeal, Norfolk Southern states in its brief that this Court "may take into account whether a particular award is excessive by comparing it to awards in other similar cases." It also urges us to consider "the particular injuries and their effects under the particular circumstances on the particular injured." Norfolk Southern then cites various cases in which jury verdicts have been declared excessive, however, none of the cases described by Norfolk Southern appear similar to the case at bar. Norfolk Southern cites one case involving a "concussion and minor injuries," another involving

---

[13] In **Miller**, the Maryland Court of Appeals extensively discussed the history and nature of FELA claims and noted that the "mode of legislation has created a friendly atmosphere toward injured railroad workers in the courts, both state and federal." 858 A.2d at 1032 (quoting Reginald Parker, "FELA or Uniform Compensation for All Workers," 18 *Law and Contemporary Problems* (Duke University School of Law, 1953) 208 n.3). "Verdicts are high, probably higher than they would be in ordinary tort suits for similar injuries." *Id.* Moreover, "the rewards for a successful plaintiff are invariably higher than would be the case with a workers' compensation award." *Id.*

"compound fractures of foot," two involving leg amputations, one involving a "back injury," one involving "damage to ulnar nerve and cervical spine," another involving a torn arm muscle, and finally, a case involving wrist and knee injuries. In **Pomeroy**, we stated that, based upon our review of the broad range of actions for damages brought under FELA, "there is no objective standard for the award of damages for pain and suffering. They are, to use the vernacular, 'all over the place.'" **Id.** at *19.

In this case, Mr. Jordan suffered a significant trauma to the back of his head, a laceration to his scalp, loss of consciousness, amnesia, fractures at three different levels of his spine, which required the removal of bone from his hip area to be fused to the vertebra, in addition to the insertion of a metal rod and screws, a fracture of his left tibia and fibula, which led to the insertion of two screws below his left knee and another two screws above his ankle, a fracture of the left shoulder blade, an open wound on his right upper thigh area and a minor fracture in the upper part of the femur in the right hip, a lacerated spleen, and a collapsed lung. Mr. Jordan awoke with horizontal double vision due to abnormal eye alignment and still suffered from slightly impaired vision at the time of trial, despite modified glasses. Mr. Jordan testified that he still had problems with his left ankle, lower leg, and knee, along with discomfort in his hips, lower back and shoulder. His orthopaedic surgeon testified that Mr. Jordan had developed traumatic arthritis because of his injuries, and he would, more likely than not, need to undergo knee replacement surgery. The orthopaedic surgeon described the screws in Mr. Jordan's knee as "prominent" and "very irritating" beneath the skin. Mr. Jordan said he takes Celebrex everyday in addition to six to eight Tylenol per day, and his orthopaedic surgeon testified that he would need to take an anti-inflammatory drug for his back pain indefinitely, along with possible epidural injections. Mr. Jordan submitted evidence of $827,859 in economic damages *excluding* the amount of his medical bills incurred prior to trial. We have considered Mr. Jordan's injuries and the effects of those injuries under the particular circumstances, as Norfolk Southern asked us to do, and we conclude that the $4 million judgment entered on the jury verdict is not excessive.

### D. Motion for Mistrial and Passion, Prejudice, or Caprice on the Part of the Jury

Norfolk Southern presents several arguments on appeal regarding this issue. First, it addresses alleged "misconduct of counsel in argument." Norfolk Southern claims that where "prejudicial . . . remarks of counsel repeatedly enter the record, a new trial must be granted." Norfolk Southern cites specific statements made by counsel for Mr. Jordan during opening and closing arguments, which it contends were "inflammatory remarks." However, Norfolk Southern does not cite to anywhere in the record where it objected to these statements, and we find no such objection.

"The law is well-settled in this state that '[a]n objection to the remarks or conduct of counsel must be made at the trial and a ruling had thereon, or they will not be considered on appeal.'" **Ward v. Glover**, 206 S.W.3d 17, 39 (Tenn. Ct. App. 2006) (quoting *Lee v. Lee*, 719 S.W.2d 295, 299 (Tenn. Ct. App. 1986)). When counsel fails to object to remarks made in opening or closing statements, counsel shall be considered as having waived these issues on appeal. **Hill v. Simpson**,

No. E2005-02401-COA-R3-CV, 2007 WL 2780376, at *4 (Tenn. Ct. App. Sept. 25, 2007) (citing Tenn. R. App. P. 36). In addition, Rule 3(e) of the Tennessee Rules of Appellate Procedure provides, in part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, *misconduct of jurors, parties or counsel*, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.[14]

(emphasis added). Norfolk Southern did not allege misconduct of counsel in its motion for new trial. At the hearing on the motion for new trial, counsel for Norfolk Southern mentioned one of the allegedly improper statements made by counsel for Mr. Jordan, and stated, "We did not cite as error the fact that Mr. Keith made that argument." Because Norfolk Southern did not raise this argument in the trial court, it cannot do so for the first time on appeal.

Next, Norfolk Southern claims that the trial court should have granted its motion for a mistrial based on the testimony of one of the witnesses, and because it did not, the jury relied on that improper testimony and entered its verdict based on passion or prejudice. Prior to the trial, the trial judge had considered the issue of whether evidence of prior accidents or incidents would be admissible. The judge had not ruled on the issue before trial because he determined that he needed to hear other proof in the case before he could determine whether the evidence of other accidents would be admissible. The judge apparently instructed the attorneys not to introduce evidence of prior accidents until he had an opportunity to consider the evidence and rule on the issue. At trial, Steve Rhodes, a long-time employee of Norfolk Southern and member of Norfolk Southern's Safety Committee, was called to testify. Mr. Rhodes was testifying about a committee meeting held in 2002, at which complaints were made regarding the track clearance at Broadway. Mr. Rhodes testified that the superintendent present at the meeting directed that the discussion of track clearance not appear in the minutes of the committee's meeting. The following exchange then took place, during direct examination by counsel for Mr. Jordan:

> Q.   Mr. Rhodes, if you were so concerned about this area and you were making complaints about it, how come you let that happen?
> A.   I shouldn't have, but we'd already had people get hurt in this area before, and I should have –
> Q.   Hold on one second, Mr. Rhodes.

---

[14] However, "an issue regarding the propriety of statements made by opposing counsel during closing argument is waived if raised *for the first time* in a motion for new trial." **McCall v. Bennett**, 243 S.W.3d 570, 573 (Tenn. Ct. App. 2007) (emphasis added). Here, the issue was not raised during arguments or in the motion for new trial.

Counsel for Norfolk Southern then moved for a mistrial based upon the reference to prior accidents. Because it was late in the day, the trial judge dismissed the jury. In discussing the matter with the trial judge, the attorneys finally decided they would not introduce any evidence regarding prior accidents or incidents. The trial judge denied Norfolk Southern's motion for mistrial and decided to give a curative instruction to the jury. Norfolk Southern approved the substance of the following curative instruction, which was given when the trial resumed the following Monday:

> Before we get started, last Thursday at the end of the day you heard the witness make reference in his testimony to other accidents. I must tell you that there is no evidence before you regarding any other accident or accidents, plural, nor will there be any such evidence. You are instructed to disregard any such testimony and treat it as though you had never known it. Such testimony should not play any role in your deliberations, nor in your ultimate decision regarding this case.

Counsel for Norfolk Southern refused the trial judge's offer to poll the jury members regarding their oath and ability to try the case.

"It is well settled that the decision of whether to grant a motion for mistrial is within the sound discretion of the trial court." *Willis v. Settle*, 162 S.W.3d 169, 188 (Tenn. Ct. App. 2004) (citing *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996)); *see also Hunter v. Ura*, 163 S.W.3d 686, 699 (Tenn. 2005). Absent an abuse of discretion, we will not disturb the trial court's decision to deny a motion for mistrial. *Willis*, 162 S.W.3d at 188; *DeLapp v. Pratt*, 152 S.W.3d 530, 539 (Tenn. Ct. App. 2004). "We should not reverse for 'abuse of discretion' a discretionary judgment of a Trial Court unless it affirmatively appears that the Trial Court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining." *McCullough v. Johnson City Emergency Physicians, P.C.*, 106 S.W.3d 36, 47-48 (Tenn. Ct. App. 2002) (citing *Marcus v. Marcus*, 993 S.W.2d 596 (Tenn. 1999)).

In this case, we find no abuse of discretion in the trial court's decision to deny the motion for mistrial. When the witness's statement is viewed in the context of the entire trial, it does not affirmatively appear to this Court that the statement caused an injustice or injury to Norfolk Southern. The witness did not even finish his sentence before counsel for Mr. Jordan stopped him. Counsel for Mr. Jordan explained that he had instructed all the witnesses not to mention prior accidents, and counsel's question to the witness did not appear to be designed to elicit a response regarding prior accidents. The jurors were instructed to disregard the testimony, and Norfolk Southern declined to have the trial judge poll the jury. We find that any prejudice which may have resulted from the witness's testimony was cured by the trial court's adequate instruction to the jury.

Finally, Norfolk Southern briefly argues that Mr. Jordan's witnesses "gave opinions on the safety of the workplace in violation of the trial court's orders." Norfolk Southern does not cite to the record or any authority in support of this argument. We note that at one point, a witness who was describing Broadway said, "[the] tracks are too close together to work safely." The trial judge

interrupted the witness and invited the lawyers to the bench. After a brief discussion, the judge instructed the jury as follows:

> Ladies and gentlemen, the issue of whether the area in question constituted a safe place to work will be up to you to decide. You should disregard the testimony of this or any witness who inadvertently expresses an opinion on that subject, and you should treat it as though you had never heard it.

We find no reversible error in the trial court's action.

### E. Evidence to Support the Jury's Verdict

Next, Norfolk Southern argues that the trial court erred in refusing to grant its motion for a new trial because the jury award is contrary to the weight of the evidence. As previously discussed, in order to grant a new trial in a FELA case tried in state court, the trial court must apply the federal standard for considering the motion and find that the verdict is "against the clear weight of the evidence." *Blackburn*, 2008 WL 2278497, at \*16. The *Blackburn* Court explained that the Tennessee standard and the federal standard for reviewing motions for new trial are not the same or even substantially similar. *Id.* at \*7. In Tennessee, when a motion for new trial asserts that the jury's verdict is contrary to the weight of the evidence, it is the duty of the trial judge to weigh the evidence and determine whether it preponderates against the verdict, and if so, to grant a new trial. *James E. Strates Shows, Inc. v. Jakobik*, 554 S.W.2d 613, 615 (Tenn. 1977) (citing *Vaulx v. Tenn. Cent. R.R. Co.*, 120 Tenn. 316, 108 S.W. 1142 (1907)). The trial judge must be independently satisfied with the verdict rather than simply deferring to the jury's decision. *Holden v. Rannick*, 682 S.W.2d 903, 906 (Tenn. 1984). "Federal decisions, on the other hand, expressly disclaim the 'thirteenth juror' description." *Blackburn*, 2008 WL 2278497, at \*16. Under the federal standard,

> A court may set aside a verdict and grant a new trial when it is of the opinion that the verdict is against the clear weight of the evidence; however, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable. Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper.

*Id.* at \*6 (quoting *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 528-29 (6th Cir. 2005)). The trial judge should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of fact, he would have reached a different result. *Id.* at \*5 (citing 6A *Moore's Federal Practice* § 59.08 [5] (1996)). He should "abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result." *Id.* at \*6 (quoting 6A *Moore's Federal Practice* § 59.08[5] (1996)). The *Blackburn* Court summarized the distinction between the standards as follows:

> [A]t a very basic level, the standards are quite different since the Tennessee standard uses "preponderance" of the evidence, while the federal standard requires that the verdict be outweighed by the "clear" weight of the evidence. Under state law if a

judge is "dissatisfied" with a jury verdict then the trial court is at liberty to order a new trial. Under the federal standard, the verdict must be unreasonable. Under state law a court must make an independent decision, while under federal law if a reasonable juror could have reached the verdict, the trial court is to defer. We believe that the differences between the standards are both apparent and significant.

*Id.* at *7.

On appeal, in FELA cases, "orders on new trial motions based on sufficiency of the evidence are reviewed on an abuse of discretion standard." *Id.* at *16 (citing *U.S. v. Blackwell*, 459 F.3d 737, 768 (6th Cir. 2006); *Tisdale*, 415 F.3d at 528; 11 Wright, Miller & Kane, *Federal Practice & Procedure: Civil 2d* § 2819 (1995)). "A trial court abuses its discretion in its decision on a new trial if the court (a) relies on clearly erroneous findings of facts, (b) improperly applies the law, (c) uses an incorrect legal standard or (d) is otherwise 'clearly erroneous.'" *Id.* (citing *Blackwell*, 459 F.3d at 768).

In this case, the trial court's order on the motion for new trial is silent as to whether it used the Tennessee or federal standard for reviewing the sufficiency of the evidence. However, at the hearing, the trial judge referred to his role as the thirteenth juror. The **Blackburn** Court was faced with the same situation, where the trial judge's statements at the hearing indicated that she used the Tennessee standard rather than the federal standard. *Id.* at *16. In **Blackburn**, however, the trial court had *granted* a new trial upon finding that the evidence preponderated against the jury's verdict. *Id.* The Court of Appeals granted the plaintiff's application for extraordinary appeal and concluded that the trial court erred in applying Tennessee's thirteenth juror standard. *Id.* at *1. The Court remanded for the trial court to consider whether the verdict was against the "clear weight" of the evidence under the harsher federal standard. *Id.* at *17. In this case, the trial judge denied the motion for new trial upon finding that the jury's verdict *was* supported by the preponderance of the evidence. Under the circumstances of this case, it is not necessary to remand the case for the trial judge to reconsider the motion under the federal standard. If the trial judge found that the evidence does not preponderate against the jury's verdict, then, by necessity, he found that the verdict is not against the clear weight of the evidence.

Next, we turn to an examination of the merits of Norfolk Southern's arguments on appeal regarding the sufficiency of the evidence. Norfolk Southern claims that it is inconsistent and against the clear weight of the evidence to find that Burlington Northern was not negligent and also find that Mr. Jordan was not negligent. At trial, conflicting testimony was presented regarding whether the headlight on the passing Burlington Northern train was turned on, turned off, or dimmed. The jury was asked, "Was the Defendant Burlington Northern Santa Fe Railroad Company negligent under the Court's instructions: (a) by turning the headlight off? (b) by not engaging the bell or horn or both?" The jury answered "no" to both questions. On appeal, Norfolk Southern argues that the jury

implicitly found that the Burlington Northern train's headlight must have been on.[15]  Norfolk Southern then claims that if the headlight was on, that "necessarily means" that Mr. Jordan was negligent by stepping into the train's path.  We disagree.

Even assuming *arguendo* that the jury did conclude that the headlight was on, that does not "necessarily mean" that Mr. Jordan was negligent.  Mr. Jordan was performing the tasks necessary to uncouple the locomotives, which required him to be on the Norfolk Southern tracks.  Witnesses testified that this area was called the "red zone" or "danger zone" because a person working on the tracks was in danger.  The Norfolk Southern engineer explained that during the process of uncoupling the locomotives from the railcars, the train is unsecured and could roll.  Therefore, the area off the tracks is considered the "safe zone."  The engineer testified that at Broadway, the area between the different tracks that is supposed to be the "safe zone" is "just too tight."  He was asked whether it was possible to work between the tracks at Broadway without "fouling the tracks," or crossing into the path of other trains, to which he responded, "If you were about two feet tall, you could."  Another railroad employee testified that it was impossible to perform the duties of a conductor at Broadway without fouling the tracks.

Mr. Jordan testified that he had been taught to perform his duties with one foot inside the rail and one foot outside the rail because of the danger of cars rolling.  The Norfolk Southern engineer testified that when working between the cars in that manner, an employee's vision of the track is blocked, and he or she cannot see what is coming down the track.  The Burlington Northern engineer testified that he had dimmed the locomotive's headlight.  In addition, Mr. Jordan was required to wear earplugs and safety goggles while working.   Other railroad employees testified about how trains can sneak up on you at Broadway.  The engineer of the Burlington Northern train testified that he was likely operating the train in its quieter idle mode at the time of the accident.  The engineer said he briefly saw Mr. Jordan pivot out or raise up from between the cars just three to four seconds before he heard a thump, but he did not see Mr. Jordan take a step.  The engineer said it happened so quickly that he did not have time to ring the bell or blow the whistle.

Under the federal standard, if a reasonable juror could reach the challenged verdict, a new trial is improper.  **Blackburn**, 2008 WL 2278497, at *6 (quoting *Tisdale*,  415 F.3d at 528-29).  Considering all the evidence, we cannot say that the trial court abused its discretion in denying Norfolk Southern's motion for new trial based on the sufficiency of the evidence.

### F.  The Letter Agreement

When Mr. Jordan was injured, he was uncoupling the Norfolk Southern train's locomotives from its railcars in preparation for the Norfolk Southern railcars to be interchanged with Burlington Northern.  The Norfolk Southern yardmaster explained that Norfolk Southern would generally deliver an interchange train downtown and "run the motors around it," then Burlington Northern would "come get it and pull it off to their railroad."  However, the Burlington Northern train that struck Mr. Jordan was not involved in an interchange.  It was en route to Missouri.

---

[15]  We note that Norfolk Southern does not raise any issue challenging the verdict form.

Norfolk Southern and Burlington Northern had entered into an agreement regarding their interchange operations on or about November 5, 1999. This "Letter Agreement" reads, in part:

This follows conversations between local Burlington Northern and Santa Fe and Norfolk Southern Railway operating officers concerning use by The Burlington Northern and Santa Fe Railroad Company of Norfolk Southern Railway Company locomotives in performing interchange between [Norfolk Southern's] Forrest Yard and [Burlington Northern's] Tennessee Yard, both located in Memphis, Tennessee.

[Norfolk Southern] is agreeable to granting such use of its locomotives in such interchange. The parties hereto agree that, in absence of a formal interchange agreement between [Burlington Northern] and [Norfolk Southern] for interchange in Memphis, Tennessee, they are willing to enter into this Letter Interchange Agreement for such interchange, subject to the following terms and conditions:

. . . .

**Section 1. Operating Plan [Norfolk Southern Delivery to Burlington Northern]**

Upon arrival of inbound [Norfolk Southern] train carrying interchange traffic to [Burlington Northern] in Memphis, Tennessee, [Norfolk Southern] inbound crew will deliver the train to [Burlington Northern] . . . and perform the following tasks to their train: . . . .

. . . .

**Section 3. Interchange of Cars and [Norfolk Southern] locomotives**

Interchange of rail cars and exchange of [Norfolk Southern] locomotives shall be accomplished simultaneously with completion of delivery . . . as defined in Sections 1 and 2 of this Letter Agreement. Said interchange, including [Norfolk Southern] locomotives, shall transfer to the account of the receiving carrier for purposes of determining liability . . . as hereinbelow defined. . . .

**Section 4. Liability of Cars and [Norfolk Southern] Locomotives:**

. . . .

(b) The responsibility of the parties hereto as between themselves for loss of, damage to and destruction of any property whatsoever and injury to or death of any person or persons whomsoever resulting from, arising out of, incidental to or occurring in connection with this agreement shall be determined as follows:

(1) Whenever any loss of, damage to or destruction of any property whatsoever or injury to or death of any person or persons whomsoever, or any damage to or destruction of the environment whatsoever . . . occurs with the trains, locomotives, cars or equipment of, or in the account of, only one party hereto being involved, that party so involved shall assume all liability therefor and bear all cost and expense in connection therewith, including without limitation all costs and expense for repairs to Interchange Trackage, and all costs and expense related to

clearing of derailments, and shall forever protect, defend, indemnify and save harmless the other party . . . from and against any such liability, cost and expense.

(2) Whenever any such loss of, damage to or destruction of any property whatsoever, or injury to or death of any person or persons whomsoever, or any damage to or destruction of the environment whatsoever . . . occurs with the trains, locomotives, cars or equipment of, or in the account of, both parties being involved, each party shall separately assume and bear all liability, cost and expense for loss of or damage to said trains, locomotives, cars . . . and equipment operated by each of them and for injury to and death of each of their officers, agents and employees and persons in each of their care and custody, and the parties further agree that all liability, cost and expense for injury to and death of any other person or persons whomsoever, . . . shall be borne equally by the parties . . . . Whenever any liability, cost or expense is assumed by or apportioned to a party hereto under the foregoing provisions, that party (Party 1) shall forever protect, defend, indemnify and save harmless the other party . . . from and against that liability, cost and expense assumed by Party 1 or apportioned to Party 1.

(c) The foregoing provisions of paragraphs (a) and (b) of this Section 4 shall apply regardless of considerations of fault or negligence. . . .

. . . .

**Section 5.  Investigation**

(a) Except as provided in Section 6(b) hereof, all claims, injuries, deaths, property damages, and losses arising out of or connected with this Letter Agreement shall be investigated, adjusted, and defended by the party bearing the liability, cost, and expense therefor under the provisions of this Letter Agreement.

. . . .

(d) All costs and expenses in connection with the investigation, adjustment, and defense of any claim or suit under this Letter Agreement shall be included as costs and expenses in applying the liability provisions set forth in this Letter Agreement . . . .

Thus, the critical issue is whether this injury occurred "with the trains, locomotives, cars or equipment of, or in the account of" one or both of the parties to the Letter Agreement "being involved."

The interpretation of a written agreements is a question of law, which we review de novo on the record, according no presumption of correctness to the trial court's conclusion. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703 (Tenn. 2008) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999); *Union Planters Nat'l Bank v. Am. Home Assurance Co.*, 865 S.W.2d 907, 912 (Tenn. Ct. App. 1993)). "The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Id.* at

703-704 (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano*, 995 S.W.2d at 95 (citing *Hamblen County v. City of Morristown*, 656 S.W.2d 331, 333-34 (Tenn. 1983); *Bob Pearsall Motors, Inc.*, 521 S.W.2d at 580)). The entire contract should be considered in determining the meaning of any or all of its parts. *Maggart*, 259 S.W.3d at 704 (quoting *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)). All of the contract provisions should be construed in harmony with each other, if possible, to promote consistency and avoid repugnancy between the various provisions of a single contract. *Guiliano*, 995 S.W.2d at 95 (citing *Rainey v. Stansell*, 836 S.W.2d 117, 118-19 (Tenn. Ct. App. 1992), *perm. app. denied* (Tenn. 1992)).

Norfolk Southern argues that Burlington Northern's train was the only one physically "involved" in the accident, because it was the train that caused the injury to Mr. Jordan. Accordingly, Norfolk Southern claims that Burlington Northern must assume all liability for the accident pursuant to paragraph (b)(1). Based on its reading of the contract, Norfolk Southern contends that Burlington Northern is liable for the entire portion of the judgment against Norfolk Southern, in addition to $332,584.81 for Norfolk Southern's attorneys' fees.

Burlington Northern insists that Norfolk Southern's train was "involved" in the accident because Mr. Jordan was working on the Norfolk Southern train when he was injured. Burlington Northern also points out that the Norfolk Southern train was the only train "involved" in interchange activity at the time of the accident, which is the subject of the Letter Agreement. Therefore, Burlington Northern contends that, regardless of whether its train was also involved, Norfolk Southern was involved and must assume all liability for the accident pursuant to either paragraph (b)(1) or paragraph (b)(2). Burlington Northern also claims that Norfolk Southern is responsible for the legal fees Burlington Northern incurred in defending the claim in the amount of $312,062.10.

The trial court found that Mr. Jordan "was performing a task that is contemplated by the [Letter Agreement]. That is, he was . . . preparing a Norfolk Southern train for interchange to Tennessee Yard by a Burlington Northern crew." The trial court then concluded that the "trains of both parties [were] involved," pursuant to section 4(b)(2), so Norfolk Southern must assume all liability for the injury to its own employee. The court further held that each party would be responsible for its own legal expense.

We agree with the trial court's conclusion that this was an accident or loss contemplated by the Letter Agreement. Section (b) provides that it governs "[t]he responsibility of the parties hereto as between themselves for . . . injury to or death of any person or persons whomsoever resulting from, arising out of, incidental to or occurring in connection with this agreement." Mr. Jordan was performing the tasks required to prepare the Norfolk Southern train for the interchange when he was

injured. Thus, his injury resulted from or arose out of the Letter Agreement, and section (b) applies to determine liability.

Next, we reject Norfolk Southern's contention that the Burlington Northern train was the only train "involved" because it was the only train that inflicted physical injury to Mr. Jordan. As stated above, we must determine the parties' intention by considering the entire contract. Section (b) broadly states that "[t]he responsibility of the parties hereto as between themselves for loss of, damage to and destruction of any property whatsoever and injury to or death of any person or persons whomsoever resulting from, arising out of, incidental to or occurring in connection with this agreement shall be determined as follows . . . ." The subparagraphs of section (b) then address liability for "loss of, damage to or destruction of any property whatsoever or injury to or death of any person or persons whomsoever, or any damage to or destruction of the environment whatsoever." Considering the entire agreement, we do not believe the parties intended the term "involved" to carry such a narrow construction. As Burlington Northern points out, if we were to accept Norfolk Southern's narrow definition of the term "involved," there would be a wide range of accidents for which neither party would be "involved." For example, if either party's employee fell on the tracks during an interchange, or was struck by a third party's train, neither of the parties to the Letter Agreement would be "involved" under Norfolk Southern's interpretation of the term. Norfolk Southern's strained definition of the term "involved" would frustrate the intention of the parties to contractually determine liability for losses "resulting from, arising out of, incidental to or occurring in connection with" the Letter Agreement.

For similar reasons, we also respectfully disagree with the trial court's conclusion that both parties were "involved," within the meaning of the Letter Agreement. If the term "involved" was viewed in isolation, we might agree that the injury occurred with both parties' trains being involved in the accident. However, we must consider the entire contract in determining the meaning of any or all of its parts. *See* **Maggart**, 259 S.W.3d at 704. The parties entered into the Letter Agreement "for interchange in Memphis, Tennessee, . . . subject to the following terms and conditions . . . ." The Letter Agreement addressed the issue of which party would assume liability if "the trains, locomotives, cars or equipment of, or in the account of, only one party hereto [is] involved," and if both parties were involved. The Burlington Northern train that struck Mr. Jordan was not in any way involved in the interchange activity, which is the subject of the Letter Agreement, at the time of the accident. The Burlington Northern train was simply passing through Broadway on the way to Missouri when it struck Mr. Jordan. Given the purpose of the Letter Agreement, we do not believe the parties intended to define Burlington Northern's liability in general, for operations beyond its participation in this specific interchange. Therefore, we conclude that Burlington Northern has the more reasonable interpretation of the Letter Agreement, based upon the usual, natural, and ordinary meaning of the contractual language: the Letter Agreement allocates liability depending on whether one or both parties were involved in the interchange operation at the time of the injury. Norfolk's Southern's interpretations of the term "involved" ignore the purpose of the contract. The contract is to govern interchange operations, and the liability section spells out which party will be responsible for "injury to or death of any person or persons whomsoever resulting from, arising out

of, incidental to or occurring in connection with this agreement." Burlington Northern's actions were in no way connected to the agreement.

In conclusion, we find that section 4(b)(1) applies and that the only party "involved" in interchange at the time of the injury was Norfolk Southern. Thus, pursuant to the Letter Agreement, Norfolk Southern "shall assume all liability [for the injury] and bear all cost and expense in connection therewith . . . and shall forever protect, defend, indemnify and save harmless the other party . . . from and against any such liability, cost and expense." Section 5(a) provides that injuries and losses "arising out of or connected with this Letter Agreement shall be . . . defended by the party bearing the liability, cost, and expense therefor under the provisions of this Letter Agreement." Section 5(d) further provides, "All costs and expenses in connection with the . . . defense of any claim or suit under this Letter Agreement shall be included as costs and expenses in applying the liability provisions set forth in this Letter Agreement . . . ." Therefore, we conclude that Norfolk Southern must indemnify Burlington Northern for its cost of defending against Mr. Jordan's claim.

## IV. CONCLUSION

For the aforementioned reasons, we affirm the trial court's judgment entered on the jury verdict. We reverse the trial court's order dismissing Burlington Northern's cross-claim and remand for the entry of an order consistent with this opinion. Costs of this appeal are assessed against Norfolk Southern Railway Company, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.