736 S.W.2d 112 (1987)
ILLINOIS CENTRAL GULF RAILROAD COMPANY, Petitioner,
v.
TENNESSEE PUBLIC SERVICE COMMISSION, Respondent.
Court of Appeals of Tennessee, Middle Section, at Nashville.
May 22, 1987.
Permission to Appeal Denied August 31, 1987.
*113 Tyree B. Harris, III, Dodson, Harris, Robinson & Aden, Nashville, Jeffrey S. Berlin, John A. Menke, Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Washington, D.C., Richard M. Kamowski, Commerce Atty., Illinois Cent. Gulf R.R., Chicago, Ill., for petitioner.
Donald L. Scholes, Asst. Gen. Counsel, Tennessee Public Service Com'n, Nashville, for respondent.
Permission to Appeal Denied by Supreme Court August 31, 1987.

OPINION
CANTRELL, Judge.
In an order issued on July 11, 1986, the Tennessee Public Service Commission rejected the contention of the Illinois Central Gulf Railroad Company that questions of safety standards for the construction and maintenance of walkways in railroad yards had been preempted by federal law. The PSC therefore affirmed an order of an administrative law judge finding that nine areas in ICG's Memphis yard were in violation of the PSC's walkway regulations. ICG appeals that decision under Rule 12, *114 Tenn.R.App.Proc., and asserts, in addition to its preemption claim, that the PSC mis-applied the regulations and that the decision is not supported by substantial and material evidence in the record.
On August 14, 1985, the PSC issued a show cause order directing ICG to appear at a hearing and show cause why it should not be found in violation of T.C.A. § 65-3-123. Section 65-3-123 requires railroads operating in Tennessee to abate or remove dangerous and unhealthy conditions along their rights-of-way, in yards, and in terminals. The show cause order stated that the alleged violations were based on the fact that eleven areas in ICG's Memphis yard violated the PSC regulations entitled "Specifications of Safety Standards in Terminals, Yards, and along Rights-of-Way of Railways  Walkways." Section 1220-3-1-.11, Tenn.Admin.Comp. On December 6, 1985, an administrative law judge found that nine of the eleven areas were in violation of the walkway regulations.
ICG took exception to the initial order and asserted before the PSC that the walkway rule had been preempted by federal railroad safety regulations. The PSC affirmed the decision of the administrative law judge.

A. THE PREEMPTION ISSUE
Article VI of the U.S. Constitution provides that laws of the United States made under the authority of the U.S. Constitution are the supreme law of the land. Thus, state laws that interfere with or are contrary to federal law are a nullity. Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). The power given to Congress by Article VI of the Constitution results in the so-called preemption doctrine: "The supremacy clause of Article VI of the Constitution provides Congress with the power to preempt state laws." Louisiana Public Service Commission v. Federal Communications Commission, 476 U.S. 335, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Whether Congress has done so in any particular case is a question often litigated.
Cases in which there is no direct conflict between the state and federal laws are difficult unless Congress has expressly stated its intent to occupy the field to the exclusion of the states. Rice v. Santa Fe Elevator Company, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Where neither a direct conflict nor an expressed intent to preempt are present, the courts must judge from an examination of the respective laws or regulations whether preemption has in fact occurred. Always the critical question is whether Congress intended that federal regulations supersede state law. Louisiana Public Service Commission v. Federal Communications Commission, 476 U.S. 355, 106 S.Ct. 1890, 1896, 90 L.Ed.2d 369.
The PSC adopted a walkway regulation in 1970. It requires every railroad to maintain working areas in yards, terminals, within switching limits, and in and at other points where switching may take place in the ordinary course of business in a safe condition. The regulation went on to provide that any walkway would be presumed safe if it:
(a) Is approximately level with the top of the crossties for a distance of approximately 6 inches and thereafter slopes at no greater than 8 to 1 or approximately 7°;
(b) Extends for a distance of approximately ten feet from the center line of track on both sides, except where a lesser distance is otherwise provided for clearance under § 65-623 through § 65-630 Tennessee Code Annotated;
(c) Has a reasonably smooth surface. Stone or gravel surfacing next to main lines shall be such that one hundred percent will pass a 2 1/2 inch screen, ninety-five to one-hundred percent will pass a 2 inch screen, thirty-five to seventy percent will pass a 1 1/2 inch screen, fifteen percent or less will pass a 1 inch screen and zero to five percent will pass a 1/2 inch screen. Stone or gravel surfaces next to walkways adjacent to yard tracks, industrial tracks, team or piggy-back tracks shall be on the mixture commonly called 3/4 inch, or may be such that one hundred *115 percent is expected to pass a 1 inch screen, ninety-five to one hundred percent will pass the 3/4 inch screen, fifteen to twenty-five percent will pass the 1/2 inch screen and less than ten percent will be smaller than 3/8 inch.
(d) Is kept reasonably free of debris or other objects which pose a hazard to normal walking in the area.
Tenn.Admin.Comp. § 1220-3-1-.11.
The regulation went on to provide that whether a walkway that did not conform to the regulation was unsafe was to be decided on a case-by-case basis and that the regulation was not to be construed as a blanket order but rather as a recommended practice.
Also in 1970, the U.S. Congress adopted the Federal Railroad Safety Act (FRSA). Congress declared that the purpose of the FRSA was to "promote safety in all areas of railroad operations." 45 U.S.C. § 431. Congress determined that the only way to effectively regulate railroad safety was to establish a broad national scheme of railroad safety regulation, as opposed to the then existing patchwork system of federal and state regulations. Therefore Congress enacted Section 205 of FRSA, 45 U.S.C. § 434. It provides:
The Congress declares that laws, rules regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.
Thus, all parties agree that Congress expressly indicated an intent to preempt state law on the subject of railroad safety. However, Congress made an exception for two particular situations. They are:
(1) State rules, regulations, orders, or standards where the Secretary of Transportation has not adopted a rule or regulation covering the same subject matter.
(2) State requirements that are more stringent than the federal rule or regulation if the requirement:
(a) Was drawn to eliminate or reduce an essentially local safety hazard; and
(b) Was not incompatible with any federal rule or regulation; and
(c) Did not create an undue burden on interstate commerce.
Therefore to escape preemption, the Tennessee Walkway Regulation must fit into one of the above exceptions. Neither the PSC nor the intervening Union contends that the regulation comes within the second exception. The PSC order does not mention that exception and the point is not argued in the briefs. We think that the language of the walkway regulation makes it a broad general regulation drawn for statewide application. Therefore it is not drawn to address a local condition and cannot come within the second exception.
Has the Secretary of Transportation adopted a rule or regulation covering the same subject matter? The Secretary delegated his responsibility under the FRSA to the Federal Railroad Administration (FRA) "to prescribe, or recommend, appropriate rules, regulations, orders, and standards for all areas of railroad safety", Section 431 of the FRSA. 49 C.F.R., § 1.49(m). In 1971 the FRA adopted its "track safety standards". 49 C.F.R., §§ 213.1-.241 (1985). Subpart B of these standards deals with the roadbed. It provides:
§ 213.31 Scope. This subpart prescribes minimum requirements for roadbed and areas immediately adjacent to roadbed.
§ 213.33 Drainage. Each drainage or other water carrying facility under or immediately adjacent to the roadbed must be maintained and kept free of *116 obstruction, to accomodate expected water flow for the area concerned.
§ 213.37 Vegetation. Vegetation on railroad property which is on or immediately adjacent to roadbed must be controlled so that it does not 
(a) Become a fire hazard to track carrying structures;
(b) Obstruct visibility of railroad signs and signals;
(c) Interfere with railroad employees performing normal trackside duties;
(d) Prevent proper functioning of signal and communication lines; or
(e) Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.
Subpart D deals with track structure, but its scope is defined as:
[Prescribing] minimum requirements for ballast, crossties, track assembly fittings, and the physical condition of rails.
Thus, the answer to the question of whether the PSC walkway regulation has been preempted by the federal law depends on whether subpart B or D of the track safety standards of the FRA covers the same subject matter. We conclude that they do not.
Obviously, the conclusion one reaches on this question depends on whether the phrase "the subject matter" is given a broad or narrow construction. Since walkways alongside the track are necessarily a part of the roadbed, and since a walkway touches and concerns ballast and crossties, it is possible to conclude that any federal regulation dealing with these subjects has preempted a state regulation concerning walkways.
However, we do not read the track safety standards so broadly. So far as we can tell the standards do not recognize in any fashion that walkways exist or are necessary. Subpart B addresses only two things: drainage and vegetation immediately adjacent to the roadbed. Subpart D provides that the ballast must restrain the track laterally, longitudinally, and vertically, but there is no indication whether that means that the ballast must extend beyond the ends of the crossties or that it be of a certain size so that it is safe to walk on. Although subpart B also provides that vegetation shall not interfere with railroad employees performing their normal trackside duties, one court has concluded that the reference is to workmen performing maintenance work along the railroad line and not to workmen who must walk along the track in the performance of their regular duties. Southern Pacific Transportation Company v. Public Utilities Commission of the State of California, 647 F. Supp. 1220 (N.D.Cal. 1986). Therefore, the subject matter of safe walkways has not been dealt with in the track safety standards. As the court in Southern Pacific put it "State and federal regulations, therefore, cannot be held to cover the same subject matter unless they address the same safety concerns." We agree with that conclusion.
We also recognize that there is persuasive authority to the contrary. In Norfolk & Western Railroad Co. v. Burns, 587 F. Supp. 161, 170 (E.D.Mich. 1984), the court said:
... [T]he walkways are a part of the track structure and rail system that in general present an area preempted by the FRA and are immune from further regulation by state agencies.
In Black v. Seaboard System Railroad, 487 N.E.2d 468 (Ind. Ct. App. 1986), the Indiana Court of Appeals reached the same conclusion. See also Missouri Pacific Railroad v. Railroad Commission, 653 F. Supp. 617 (W.D.Tex. 1987).
There is no way to distinguish these cases from the case at bar. We simply respectfully disagree with the conclusions reached and decline to adopt the results.
Further authority for ICG's position can be found in the position taken by the FRA itself. In at least two public announcements, the FRA has concluded that the subject of walkways is covered by the federal regulations. In a 1978 policy statement, the FRA administrator described what FRA believed to be the scope and coverage of its track safety standards. The statement included a conclusion that safety standards for walkway beside the *117 tracks in yards or along the right of way were covered in the FRA regulations. Also in a letter in 1985 the chief counsel of the FRA asserted that a California regulation requiring uniform trackside walkway widths had been preempted by the federal standards.
We are mindful of the general rule that courts should defer to the expertise of an administrative agency in matters involving the interpretation of the agency's regulations and the laws under which they operate. See Chemical Manufacturers Association v. National Resources Defense Council, Inc., 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985). This principle applies, however, only when the agency has consistently interpreted its position and when the interpretation is not inconsistent with the language, goals, or operation of the statutes in question. Id. at 134, 105 S.Ct. at 1112. We note that the FRA has made at least two starts toward adopting their own standards concerning walkways. See 36 Fed.Reg. 1974 (1971); 41 Fed.Reg. 50302 (1976). We think these efforts are inconsistent with the position that walkways are already covered by the track safety standards. Therefore we decline to adopt the position of the FRA as expressed in the policy statement and the letter from the chief counsel.
The PSC's order on the question of preemption is affirmed.

B. THE PSC'S INTERPRETATION OF THE WALKWAY REGULATION
In its order the PSC held that the walkway rule creates a presumption that walkways which do not meet its standards are unsafe. Again this holding involves an administrative agency's interpretation of its own regulations, a determination to which the courts should give great weight. However, we are of the opinion that the holding is contrary to the plain language in the regulation and therefore is clearly erroneous. Jackson Express, Inc. v. Tennessee Public Service Commission, 679 S.W.2d 942 (Tenn. 1984). Subsection (2) of the regulation says that walkways that meet its requirements shall be "deemed" to be safe. However subsections (3) and (4) specifically provide that a determination of whether walkways that do not meet the requirements of the rule are safe or unsafe must be made on a case-by-case basis; that the regulation should not be considered as a blanket order but rather as a statement of recommended practice. Other practices may be considered safe under the peculiar circumstances of each case. We are convinced that the regulation by no means creates a presumption that walkways that do not meet its specifications are unsafe. Therefore, that part of the PSC order is reversed.
The PSC also held that ICG had the burden of proving that the walkways named in the show cause order are safe. ICG intimates that the PSC's position on this point flows from the fact that it erroneously concluded that the walkway regulation created a presumption. However the PSC also relies on the fact that the legislature has placed the burden of proof on the party responding to a show cause order. T.C.A. § 65-2-109(5) provides:
(5) The burden of proof shall be on the party or parties asserting the affirmative of an issue; provided, however, that when the commission has issued a show cause order pursuant to the provisions of this chapter, the burden of proof shall be on the parties thus directed to show cause.
We are of the opinion that the PSC properly concluded that the burden of proof was on the ICG. ICG has not attacked the power of the legislature to place the burden of proof on a certain party in particular circumstances. We think it is clear that the state may place the burden of proof on a particular party as a matter of policy. See 31A, C.J.S. Evidence § 103. In fact ICG admits that the legislative placement of the burden of proof in a show cause proceeding is effective but only if the PSC has properly complied with the statutes in issuing the order. ICG argues that the PSC issued the order only because it had determined that a violation of the walkway regulation created a presumption that the walkways in the ICG yard were unsafe. *118 Therefore, the argument goes, since the order was based on a misinterpretation of the regulation, it was not issued in compliance with the statutes.
We note, however, that the show cause order recited that ICG was maintaining dangerous, unhealthy and unsafe working conditions in violation of T.C.A. § 65-3-123. The order then lists eleven areas containing the alleged unsafe and dangerous conditions. Some of the dangerous conditions related to the size of the stone used on the walkways, but there were also allegations of piles of stone on walkways and walkways of insufficient lengths. These are conditions not dealt with in the walkway regulation. Thus, we are unable to conclude that the issuance of the show cause order resulted solely from the PSC's misinterpretation of its own regulation. We hold therefore that the issuance of the order complied with the statutes and placed the burden of proof on ICG.

C. IS THE FINDING OF THE PSC THAT THE ICG WALKWAYS ARE UNSAFE SUPPORTED BY SUBSTANTIAL AND MATERIAL EVIDENCE?
ICG has focused on the size of the stone to be used on the walkways as the primary issue in this case. The Railroad contends that the finding of the PSC that the walkways are unsafe is based entirely on the fact that the walkways are not surfaced with the three-quarter inch stone called for in the walkway regulation. Hence, ICG argues that there is no substantial and material evidence that the one and one-half inch stone used by ICG on some areas is unsafe.
We think ICG misses the point with this argument. The primary focus of the show cause order is not the size of the stone used to surface the walkways. Rather, the order focuses on the lack of walkways of any description in the areas mentioned. The eleven areas cited in the are:
1. In Johnson A Yard on east end, track # A-8 thru # A-30 3/4" stone has been unloaded on the switching side of the leads. This stone still needs to be reasonably smoothed. Walkways need to be constructed 300 feet behind the switches on the body tracks.
2. The crossover track to city Y track and from the bridge to the block signal # JG-397.2, walkways have not been constructed at this location.
3. On the hump end of A Yard, switches # 1 thru # 31, walkways have not been constructed with 3/4" stone on switching side and 300 feet behind the switches on body tracks. Tracks # 18 and # 19 were under construction 300 feet behind the switches on the body track.
4. On west end of E Yard, Track # 1 thru # 7, 3/4" walkway stone has been unloaded on the switching side of the lead. This stone still needs to be constructed 300 feet behind the switches on body track.
5. On the west end of E Yard, tracks # 1 thru # 7 walkways have not been constructed 300 feet behind the body tracks.
6. Rip track lead switch, west to # C-6 switch, walkways have not been constructed with 3/4" stone on switching side and 300 feet behind the switches on body tracks.
7. From the hump lead, track # C-9 thru # C-33, walkways have not been constructed with 3/4" stone on switching side and 300 feet behind the switches on body tracks.
8. On Short C Yard, inbound lead to tracks # 7 and # 8, 3/4" stone has been unloaded on the switching side of the leads. This stone still needs to be reasonably smoothed. Walkways need to be constructed 300 feet behind the switches on the body tracks.
9. North and south bound main crossover, walkways have not been constructed at this location.
10. North and south bound crossover south of McLemore Bridge, walkway stone has been loaded in this area, but still needs to be reasonably smoothed.
11. Dividing switch south of McLemore Bridge, walkways have not been constructed with 3/4" stone.
*119 As the order shows, the problems in ICG's Memphis yard are much more serious than the size of the stone used to surface the walkways. The facts alleged in the show cause order were not controverted in the proof. ICG's engineering superintendent testified that the company was working on some of the problems and some would be addressed in the future. He did say that in areas where mud was a problem larger stone provided more effective drainage and, therefore, should be used in lieu of the smaller stone called for in the walkway regulation. He did not, however, object to using the smaller stone in other areas, nor did he testify that the smaller stone was more expensive or that its procurement placed on unreasonable burden on the company. We are of the opinion that the record fully supports the facts alleged in the show cause order.
While we have held that the walkway regulation does not create a presumption that all nonconforming walkways are unsafe, we are of the opinion that the regulation does amount to a specification calling for three-quarter inch stone on the walkways. ICG has failed to show why that part of the regulation should not be enforced. Therefore the order of the Commission should be obeyed.
The order of the PSC is modified to delete the holding that the walkway regulation creates a presumption that walkways not in compliance with it are unsafe. In all other respects the order is affirmed and the cause is remanded to the PSC for the enforcement of the order and any other necessary proceedings. Tax the costs on appeal to the appellant.
TODD, P.J. (M.S.), and LEWIS, J., concur.