NOT DESIGNATED FOR PUBLICATION

No. 113,305

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ANTHONY PANTOJA, SR.,
*Appellant*,

v.

BNSF RAILWAY COMPANY,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DAVID W. BOAL, judge. Opinion filed July 1, 2016. Affirmed.

*Davy C. Walker*, of The Law Offices of Davy C. Walker, of Kansas City, and *Daniel J. Cohen*, of Law Offices of Daniel J. Cohen, of Saint Louis, Missouri, for appellant.

*Chad M. Knight*, of Hall & Evans LLC, of Denver, Colorado, and *Kenneth L. Weltz* and *Andrew J. Ricke*, of Lathrop & Gage LLP, of Overland Park, for appellee.

Before BRUNS, P.J., POWELL and GARDNER, JJ.

*Per Curiam*: Anthony Pantoja, Sr. sued BNSF Railway Company (BNSF), his former employer, under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51, *et seq*., claiming BNSF's negligence in maintaining the yard where he worked caused cumulative-trauma injuries to his lower back and his feet. After a jury trial, the jury returned a verdict in favor of BNSF. Pantoja appeals, arguing he is entitled to a new trial because of (1) juror misconduct, (2) the failure of the trial court to recall the jury, (3) BNSF's violation of the FELA collateral source rule, (4) the trial court's refusal to amend

1

the pleadings to include a claim of negligence per se, (5) BNSF's improper statements during closing arguments, and (6) cumulative error. Finding no error by the trial court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Pantoja sued BNSF, his employer of nearly 30 years, for negligence under FELA. Because railroad employees are not under a system of workers compensation for injuries on the job, they are allowed to sue their employer for damages caused by the employer's negligence. Such actions may be brought in Kansas courts. See *Davila v. BNSF RY. Co.*, No. 107,533, 2013 WL 1859208, at *2 (Kan. App. 2013) (unpublished opinion). Pantoja claimed at trial that throughout his career as a train inspector, the ground conditions were poor due to inadequate drainage, standing water, potholes, ruts and negligent maintenance by BNSF. He claimed the ground conditions caused cumulative-trauma injuries to his lower back and bilateral Morton's Neuromas in his feet occurring in the course and scope of his employment as a train inspector for BNSF.

At trial, Pantoja presented evidence of poor roadway and walkway conditions. An expert in the fields of engineering safety, biomedical engineering, and injury causation analysis testified that these conditions posed an unreasonable risk of injury to employees of BNSF. Pantoja also had a railroad industry consultant testify that the cause of the poor conditions at the BNSF yard was inadequate drainage, describing the yard as a muddy bog, and he testified to federal regulations relating to drainage of railroad yards. The jury received reports from several doctors about Pantoja's injuries. BNSF did not present contrary expert medical testimony.

The jury heard from a number of Pantoja's coworkers who had worked in the same area of the yard as Pantoja over the years. When asked if the yard was a reasonably safe place for an inspector, such as Pantoja, to work, each of them answered, "Yes." The jury

2

also heard from the BNSF manager in charge of maintaining the yard, who testified that taking into consideration the effects of wet and winter weather, it was not realistic to expect there would never be potholes, ruts, or uneven surfaces in the yard. A civil engineer also testified that the drainage system was properly designed, that the manpower and equipment BNSF devoted to maintaining the yard was appropriate, that the roadways and walkway were adequately maintained, and that the yard was a reasonably safe place to work.

After 2 days of deliberations, the jury returned a 10-2 verdict for BNSF. Pantoja filed a motion for judgment as a matter of law or in the alternative a motion for a new trial alleging, among other things, juror misconduct. To properly investigate the allegations of juror misconduct, Pantoja requested that the jury be recalled. The district court denied Pantoja's request for relief.

Pantoja timely appeals.

DID THE DISTRICT COURT ABUSE ITS DISCRETION IN DENYING PANTOJA'S MOTION FOR NEW TRIAL?

A.     *Alleged juror misconduct*

Pantoja first argues on appeal the district court erred when it denied his motion for a new trial based on juror misconduct as well as his request to recall the jury to investigate the allegations. Specifically, Pantoja argues that juror misconduct occurred when a juror disclosed to the jury that he had driven by the train yards and they "looked good."

It is within the discretion of the trial court to grant or deny a new trial under K.S.A. 2015 Supp. 60-259(a)(1)(A), and such decision will not be disturbed on appeal

3

except upon a showing of abuse of that discretion. *City of Mission Hills v. Sexton*, 284 Kan. 414, 421, 160 P.3d 812 (2007). "A trial court abuses its discretion when it denies a motion for a new trial based on juror misconduct if the [complaining party] can show that (1) an act of the jury constituted misconduct and (2) the misconduct substantially prejudiced the [complaining party's] right to a fair trial." *Duncan v. West Wichita Family Physicians*, 43 Kan. App. 2d 111, 114, 221 P.3d 630 (2010) (citing *State v. Mathis*, 281 Kan. 99, 103-04, 130 P.3d 14 [2006]), *rev. denied* 291 Kan. 910 (2011). Pantoja, as the party claiming the prejudice, bears the burden of proof. See *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 408, 6 P.3d 871, *rev. denied* 268 Kan. 885 (1999).

At trial, each side presented photographs and video of the yard in which Pantoja worked. Pantoja presented a video taken in 2003 or 2004 (the witness was unsure of the precise date) and several pictures of the yard in 2008. BNSF alleged the video and photos were taken of the worst ground conditions in the yard during periods of extreme weather. Interestingly, Pantoja sought to discredit his own expert's photos taken in February 2011, just after Pantoja's employment ended in January 2011, alleging the yard was staged prior to the inspection as a result of unprecedented and orchestrated maintenance.

BNSF offered into evidence the photographs taken by Pantoja's expert in February 2011, photos taken by BNSF's expert during a site inspection in February 2012, and some aerial photographs of the yard. Witnesses familiar with the road conditions during Pantoja's career at BNSF laid the foundation for the photographs. They testified the photographs were representative of the prevailing conditions during the relevant time period.

At the beginning of trial, the district court instructed the jury:

"Do not go to any scene. It may have changed, and the attorneys will provide you with the necessary information you need concerning the scene at the railroad yard. . . .

4

. . . .

". . . You must not listen to discussions among other people about the subject matter of this case, visit the scene, or if you happen to pass by the scene, do not stop to examine it."

After trial, one of the two dissenting jurors, Juror Leng, provided an affidavit to Pantoja, alleging that during deliberations Juror Leroy stated he drove out to the yard where Pantoja had been employed, told the jury the yard was well maintained, and expressed his disbelief in Pantoja's evidence because he had seen the yard for himself. Leng stated he cut off Leroy from any further comments, and there was no further discussion.

Leroy provided his own affidavit refuting Leng's allegations. Leroy claimed he merely told the other jurors he had driven by the yard while a passenger in a car traveling 55 miles per hour on the highway across a bridge and that he was cut off from any further comments. He stated the driver did not stop or slow down, and he was unable to see anything specific about the ground conditions. Leroy' location when he passed by the yard was 1 1/2 miles from the yard where Pantoja had worked. Another juror, Juror Denise, also provided an affidavit which corroborated Leroy' version of the events. She recalled Leroy stating he had recently seen the yard but that other jurors cut him off from any further discussion. Both Denise and Leroy stated in their affidavits that Leroy had not made any comment about the condition of the yard.

In a recorded statement, Leng later clarified that Leroy only stated he had driven by the yard on the highway and the ground conditions looked good. Leng reaffirmed that no further discussions were had on the matter.

The district court held there was no juror misconduct because the current condition of the yard had no relevance in this case and because Pantoja's claims that he was injured

5

because of working conditions in the yard occurred more than 5 years ago. The district court declined to recall the jury.

1.    *Did the act of one juror constitute misconduct?*

When a juror makes an unauthorized independent investigation of a material issue of fact and then reports the results of the investigation to the jury during its deliberations, there is misconduct requiring an order granting a new trial. See *Walker v. Holiday Lanes*, 196 Kan. 513, 517, 413 P.2d 63 (1966). Kansas appellate courts have found on several occasions that independent investigation by a juror necessitates a new trial. See *Kincaid v. Wade*, 196 Kan. 174, 175-76, 410 P.2d 333 (1966) (three jurors followed defendant by car after day of trial to observe her driving habits); *Walker*, 196 Kan. at 514, 516 (juror made in-depth personal inspection of bowling establishment, including location of chairs, scoring machines, posted signs, and bowling area and considerable discussion held in jury room on juror's observations); *Levy v. Jabara*, 193 Kan. 595, 599, 396 P.2d 339 (1964) (juror made independent view of store premises where plaintiff slipped and fell); *Kaminski v. Kansas City Public Service Co.*, 175 Kan. 137, 140-41, 259 P.2d 207 (1953) (jurors made independent measurements while viewing place of automobile collision); *Downs v. Fossey*, 144 Kan. 456, 459-61, 61 P.2d 875 (1936) (same); *Ortman v. U.P. Ry. Co.*, 32 Kan. 419, 421-22, 4 P. 858 (1884) (two jurors independently examined land where value was in controversy).

However, a new trial is not warranted in every instance where a juror makes an independent investigation. See, *e.g.*, *Pike v. Roe*, 213 Kan. 389, 391-92, 516 P.2d 972 (1973) (no misconduct where juror drove through accident intersection several times but did not stop, take measurements, or judge distances and during deliberations told other jurors he was familiar with intersection because juror lived close to intersection and customarily drove by it every day); *Tamplin v. Star Lumber & Supply Co.*, 16 Kan. App. 2d 352, 355, 357-58, 824 P.2d 219 (1991) (juror misconduct not sufficient to warrant new

6

trial where juror went to store in dispute to see how flooring was stored, told another juror she went, and was interrupted by presiding juror and told not to discuss it further; juror only saw what had already been testified to at trial), *aff'd as modified* 251 Kan. 300, 836 P.2d 1102 (1992); *State v. Goodnow*, 12 Kan. App. 2d 294, 299, 740 P.2d 113 (juror misconduct harmless where one juror drove to scene of accident, turned around and stopped, and then left and did not discuss visit with anyone, and another juror passed accident scene on way to visit his mother and did not discuss going to the accident scene with anyone), *rev. denied* 242 Kan. 904 (1987).

Here, the district court ruled there was no juror misconduct because what Leroy saw was not relevant to the case. The court also held that the fact Leroy drove by the yard and made a general brief observation regarding its current condition and nothing more did not constitute juror misconduct. While we are inclined to agree with the district court that Leroy' observations of the current condition of the yard were properly deemed irrelevant because, strictly speaking, the material issue in the case was the condition of the yard during Pantoja's employment which ended in 2011, even assuming the current conditions of the yard were relevant, we still agree with the district court that Leroy' actions did not constitute misconduct. In our view, the facts in the present case are similar to *Pike*, 213 Kan. at 391, in which our Supreme Court held there was no juror misconduct where a juror customarily drove through the intersection at issue every day but did not stop to take measurements or judge distances. Here, Leroy did not deliberately drive by the yard but, instead, was riding in a car that did. He only briefly observed the yard while passing by at 55 miles per hour on the highway. Based on the record, we are unwilling to disturb the district court's finding that there was no juror misconduct.

2.      *Did the misconduct substantially prejudice Pantoja?*

Even if we were to find juror misconduct here, "it is not the misconduct of jurors, alone, which necessitates a new trial, but misconduct which results in prejudice to a

litigant and impairs his right to a fair and impartial trial." *Furstenberg v. Wesley Medical Center*, 200 Kan. 277, 284, 436 P.2d 369 (1968). Again, it is Pantoja's burden on appeal to show substantial prejudice existed from the juror misconduct. See *Butler*, 27 Kan. App. 2d at 408. In our review of the issue, it is important to note that the primary role of the district court is to determine whether juror misconduct prejudiced a party:

> "[The] rule has always been that it is for the trial court to determine, in the first instance, whether misconduct on the part of the jury has resulted in prejudice to a litigant, and that its judgment thereon will not be overturned unless abuse of discretion is manifest. . . .
>
> . . . .
>
> "The rationale of the rule is obvious. The trial court is situated far more advantageously to judge whether a verdict stems from misconduct than is this court, on appeal. Not only does the trial judge personally see and hear each witness but he is in a position to observe the conduct of and interrelationship existing between litigant, counsel and jury, and can intuitively sense the atmosphere in which the proceedings are being conducted. The trial court can thus call to its assistance experiences, observations and occurrences which are denied to us." *Furstenberg*, 200 Kan. at 285-86.

Unfortunately for Pantoja, he does little to show that he was prejudiced by the alleged misconduct. Although he gives an extensive analysis of prior decisions in which juror misconduct resulted in reversible error, he does not specifically state the prejudice he suffered as a result of the alleged misconduct. His brief asserts that he "details the prejudicial effect of BNSF's violation of the collateral source rule ('CSR'), and the attention the jury thereafter gave to such impermissible collateral source considerations." He then argues that under *Walker*, 196 Kan. 513, the cumulative errors of the issues argued on appeal amount to reversible error. This discussion is more appropriate for Pantoja's cumulative error argument, discussed below, and does little to maintain his burden of proof of showing substantial prejudice on appeal.

8

The facts in the present case are also similar to those in *Tamplin*, where another panel of this court held the juror misconduct did not warrant a new trial. 16 Kan. App. 2d at 358. Here, like in *Tamplin*, there was no discussion of the juror's observations. Moreover, Leroy' observations were less intentional than the juror's acts in *Tamplin*. Leroy did not go to the train yard with the intent to investigate the yard. In fact, there was no investigation. He viewed the yard as a passenger in a car travelling approximately 55 miles per hour across a bridge that was 1 1/2 miles from his location. While it is disputed if Leroy mentioned the yard's condition, it appears undisputed that no discussion of Leroy' observations occurred and that he was cut off before being able to do so. Because we find that Pantoja has not maintained his burden to show prejudicial juror misconduct, the district court did not err in denying his motion for a new trial.

B.    *Denial of motion to recall the jury*

Pantoja also argues that the district court was required to recall the jury because Leroy' misconduct related to a material issue in dispute. "Recalling jurors to answer for misconduct is within the sound discretion of the district judge." *Williams v. Lawton*, 288 Kan. 768, 788, 207 P.3d 1027 (2009).

> "Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. [Citation omitted.]" *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987); *Williams*, 288 Kan. at 788.

9

Recall of the jury is not required if the trial court can determine that the evidence supporting the prevailing party is substantial and the alleged jury misconduct did not relate to a material issue in dispute. See *Saucedo v. Winger*, 252 Kan. 718, 732, 850 P.2d 908 (1993).

Here, the district court found, based on the affidavits, there was no juror misconduct and there was ample evidence to support the verdict reached by the jury. Because we agree with the district court that there was no juror misconduct, we find the court was within its discretion to decline to recall the jury.

C.      *Alleged violations of the FELA Collateral Source Rule*

Next, Pantoja argues that the district court abused its discretion when it denied his motion for a new trial when there was evidence of collateral source benefits presented at trial. Specifically, Pantoja argues that the district court incorrectly applied Kansas law when federal substantive law was applicable. Typically, the admission of evidence lies within the sound discretion of the trial court, and we review any errors concerning the admission of collateral source benefits under an abuse of discretion standard. *Zak v. Riffel*, 34 Kan. App. 2d 93, 105, 115 P.3d 165 (2005).

Prior to trial, Pantoja requested a motion in limine to exclude all evidence regarding his retirement and any other collateral sources. BNSF argued that collateral source evidence should be allowed if Pantoja opened the door at trial. The district court ruled on the motion cryptically stating, "Having no crystal ball, I, like so many of these motions in limine I get anymore, I will have to wait and see what happens." It appears the parties and the court agreed to come back to the issue; however, the record on appeal is not clear if the motion in limine was granted or denied. During trial, the district judge did agree that talking about specific numbers regarding retirement would violate the collateral source rule.

10

During Pantoja's presentation of evidence, he played recorded testimony from his finance expert, who indirectly referenced the "30/60 rule," a retirement "'inducement'" that allows railroad employees to retire at the age of 60 if they have 30 years of service. See *Davila v. BNSF Railway Company*, No. 107,533, 2013 WL 1859208, at *5 (Kan. App. 2013) (unpublished opinion). When asked, the witness confirmed that Pantoja incurred an economic loss of wages and benefits, including Tier 1 and Tier 2 benefits, of roughly $250,000 by not retiring at age 60 with 30 years' service. Several references to a retirement age of 60 were also made during this testimony. Pantoja's attorney claimed an editing error and took responsibility for editing the testimony.

During BNSF's direct examination of a BNSF employee, the witness was asked if he would recommend working at the BNSF yard and, if so, why. The witness responded he would recommend working at BNSF because "[w]e have excellent retirement." Pantoja's counsel approached the bench and objected to this statement. He did not request a curative instruction or mistrial.

Later in trial, Pantoja's attorney introduced into evidence an entire box of medical records. In this box were documents referencing collateral sources such as photocopies of Pantoja's insurance cards with the wording "RAILROAD EMPLOYEE'S NATIONAL HEALTH & WELFARE PLAN," a progress note that stated Pantoja needed to fill out a "disability assessment form," and a treatment note listing Pantoja's occupation and "Disability."

After entry of judgment, Pantoja moved for a new trial on several bases, one of them being violation of the collateral source rule. The district court denied Pantoja's motion for a new trial, stating:

"[N]o damages were awarded so the mention of 'retirement' cannot have played a part in reducing them. Under the circumstances of this case the mere mention of retirement with

11

no mention of any amounts of money or retirement as it related specifically to [Pantoja] and where no damages were awarded did not prejudice [Pantoja]."

Collateral source benefits are payments or benefits received by a plaintiff from sources other than the defendant. See *Eichel v. New York Central Railroad Co.*, 375 U.S. 253, 254, 84 S. Ct. 316, 11 L. Ed. 2d 307 (1963). In FELA actions, admission of collateral source benefits is generally disfavored. 375 U.S. at 254.

In *Eichel*, 375 U.S. at 255, the United States Supreme Court held that trial court had properly excluded evidence of the receipt of disability payments:

"In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence. Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension. Moreover, it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act . . . were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act. . . . It has long been recognized that evidence showing that the defendant is insured creates a substantial likelihood of misuse. Similarly, we must recognize that the petitioner's receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact."

The Federal circuits have consistently interpreted *Eichel* to preclude admission of evidence of collateral benefits. See, *e.g.*, *Green v. Denver & Rio Grande Western Railroad Co.*, 59 F.3d 1029, 1033 (10th Cir. 1995); *Riddle v. Exxon Transp. Co.*, 563 F.2d 1103, 1107 (4th Cir. 1977); *Fuhrman v. Reading Co.*, 439 F.2d 10, 14 (3d Cir. 1971); see *Schroeder v. Pennsylvania R.R. Co.*, 397 F.2d 452, 456-57 (7th Cir. 1968). Another panel of this court has also held similarly. *Davila*, 2013 WL 1859208, at *6-8. These authorities also appear to reject the Kansas rule cited by the district court that the admission of collateral source benefits is harmless where the alleged tortfeasor is not found liable for the plaintiff's injuries. See *Green*, 59 F.3d at 1033 ("major reason for

12

excluding collateral source evidence is the concern that juries will be more likely to find no liability"); *Wisker v. Hart*, 244 Kan. 36, 47, 766 P.2d 168 (1988) (erroneous admission of collateral source benefits immaterial where jury fails to reach issue of damages).

Fortunately, we need not answer the question of whether the admission of collateral source evidence is per se harmless if no damages were awarded because even assuming that collateral source benefits are not admissible even for a proper purpose, we find no prejudice here. We agree with our sister panel's assertion "that the trial court is in the best position to determine the impact [the admission of collateral source benefits] had on the jury's deliberations." *Davila*, 2013 WL 1859208, at *8. The district court determined that a witness' statement that he would recommend employment at BNSF because of its "excellent retirement" could not have been prejudicial to Pantoja because it was only a passing reference, made no mention of amounts of money, and made no mention of retirement as it specifically related to Pantoja. We agree. The witness' passing reference to retirement did not reflect a deliberate attempt by BNSF to introduce collateral sources into evidence, so we will not disturb the district court's findings on this point.

D.    *District court's denial of Pantoja's motion to amend the pleadings*

Pantoja next argues that the district court erred when it denied his motion to amend his pleadings to conform to the evidence presented at trial and subsequently denied his motion for a new trial based partly on the failure to amend. Specifically, Pantoja argues the district court abused its discretion when it did not amend his pleadings to include negligence per se after Pantoja presented evidence at trial that a federal regulation regarding the walkways was violated.

At the time of the original filing, the statute governing the amendment of pleadings stated:

13

"(b) *Amendments to conform to the evidence.* When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence." K.S.A. 60-215(b).

"A trial judge is given broad discretionary power to amend the pleadings, and the exercise of such discretion will not constitute reversible error unless it affirmatively appears that the amendment allowed or denied is so material it affects the substantial rights of the adverse party." *Anderson v. Heartland Oil & Gas, Inc.*, 249 Kan. 458, 470, 819 P.2d 1192 (1991). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011). Discretion is abused when no reasonable person would adopt the view of the trial court. *State Farm Fire & Cas. Co. v. Liggett*, 236 Kan. 120, 124, 689 P.2d 1187 (1984). The legal rationale for its decision is reviewed de novo. *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, Syl. ¶ 1, 930 P.2d 1 (1996), *cert. denied* 520 U.S. 1229 (1997).

After the close of evidence, Pantoja made an oral motion to amend his pleadings to conform to the evidence presented that BNSF violated Federal Railroad Administration (FRA) regulations. BNSF renewed its prior objection to the expert's testimony after a portion of its cross-examination of the expert. BNSF presented evidence to the contrary at trial. The trial court denied Pantoja's motion to amend the pleadings.

14

After trial, Pantoja moved for a new trial based in part on the court's refusal to allow the amendment. The district court denied a new trial based on the legal conclusion that violation of a federal safety regulation does not amount to negligence per se under FELA when the regulation does not create a private cause of action and the regulations do not apply to roadways and walkways.

The district court is correct that under the common law of Kansas, negligence per se requires (1) violation of a statute, ordinance, or regulation, (2) the violation must be the cause of the damages resulting therefrom, and (3) there must be an individual right of action for injury arising out of the violation. *Pullen v. West*, 278 Kan. 183, Syl. ¶ 3, 92 P.3d 584 (2004). However, FELA is governed "'by the common law principles as established and applied in the federal courts.'" *Urie v. Thompson*, 337 U.S. 163, 174, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949) (quoting *Urie v. Thompson*, 352 Mo. 211, 218, 176 S.W.2d 471 [1943]); see *Grube v. Union Pacific R.R. Co.*, 256 Kan. 519, Syl. ¶ 2, 886 P.2d 845 (1994) (FELA actions may be brought in Kansas courts but are subject to substantive federal law).

Under FELA, conduct is deemed negligent per se if the conduct violates a statute and if such conduct "contributes in fact to the death or injury in suit, without regard to whether the injury flowing from the breach was the injury the statute sought to prevent." *Kernan v. American Dredging Co.*, 355 U.S. 426, 433, 78 S. Ct. 394, 2 L. Ed. 2d 382 (1958); see also *Walden v. Illinois Central Gulf Railroad*, 975 F.2d 361, 364 (7th Cir. 1992) ("In [a] FELA action, the violation of a statute or regulation, such as [a regulation promulgated by the FRA], automatically constitutes breach of the employer's duty and negligence per se and will result in liability if the violation contributed in fact to the plaintiff's injury.").

At trial, the federal regulations testified to were 49 C.F.R. § 213.33 (Drainage) and 49 C.F.R. § 213.103 (Ballast; general). This set of regulations "prescribes minimum

15

safety requirements for railroad track that is part of the general railroad system of transportation." 49 C.F.R. § 213.1. However, Pantoja's claims relate to the safety of the walkways, not the railroad track. Accordingly, we have to determine whether these regulations apply.

The interpretation of a regulation is a question of law. *Johnson Co. Developmental Supports v. Kansas Dept. of SRS*, 42 Kan. App. 2d 570, 582, 216 P.3d 658 (2009). 49 C.F.R. § 213.33 (Drainage) states: "Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." 49 C.F.R. § 213.103 (Ballast, general) states:

> "Unless it is otherwise structurally supported, all track shall be supported by material which will—
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
> (c) Provide adequate drainage for the track; and
> (d) Maintain proper track crosslevel, surface, and alinement."

The Federal Railroad Safety Act (FRSA), the scheme within which these regulations exist, does not specifically address walkways. In fact, "[e]very circuit that has considered the issue of walkways has concluded that the FRSA is silent on the question of walkways. The regulations are directed toward creating a safe roadbed for trains, not a safe walkway for railroad employees who must inspect the trains." *Grimes v. Norfolk Southern Railway Co.*, 116 F. Supp. 2d 995, 1002-03 (N.D. Ind. 2000). The regulations are not ambiguous and, on their face, only address the roadbed and the ballast. "Ballast" is defined as "gravel or broken stone laid in a railroad bed especially of a railroad to provide a firm surface for the track, to hold the track in line, and to facilitate drainage,"

16

and "roadbed" is defined as "the bed or foundation of a railroad on which the ties, rails, and ballast rest." Webster's Third New International Dictionary 167, 1963 (1986). The conclusion that walkways are not covered by these regulations is further bolstered by the FRA's statements regarding the regulations:

> "The issuance of a Federal rule requiring walkways on railroad bridges, trestles, and similar structures cannot be justified at the present time. First, any such rule would impose significant added burdens in terms of the large dollar cost to the railroad industry for construction of the walkways, the added hazard to persons and property and additional liability exposure for the railroads because of increased trespassing, and the possible decrease in overall railroad safety because of the diversion of resources from other maintenance and improvement projects. Secondly, neither the commenters nor the FRA has been able to demonstrate that such a rule would result in a definite or measurable improvement to railroad employee safety. Finally, if an employee safety problem does exist because of the lack of walkways in a particular area or on a particular structure, regulation by a State agency that is in a better position to assess the local need is the more appropriate response." 42 Fed. Reg. 22,185 (1977).

Other courts have agreed with this interpretation that the FRSA regulations do not apply to walkways. See, *e.g.*, *Southern Pacific Transport Co. v. Public Utilities Comm'n*, 647 F. Supp. 1220, 1225 (N.D. Cal. 1986), *aff'd per curiam* 820 F.2d 1111 (9th Cir. 1987); *Grimes*, 116 F. Supp. 2d at 1002; *Elston v. Union Pacific Railroad Co.*, 74 P.3d 478, 487 (Colo. App. 2003); *Illinois Central Gulf Railroad Co. v. Tennessee Public Service Comm'n*, 736 S.W.2d 112, 116 (Tenn. App. 1987).

Because the regulations Pantoja alleges BNSF violated do not cover walkways, the district court did not commit reversible error when it declined to amend the pleadings to include negligence per se and Pantoja was not entitled to a new trial because of the district court's refusal to allow the amendment.

17

E.     *Alleged improper statements by defense counsel*

Pantoja next argues on appeal that BNSF's counsel made improper comments during closing arguments accusing Pantoja's attorney of manufacturing the case. During closing arguments, BNSF's counsel stated:

> "What happened? How did [Ira Thomas, another FELA plaintiff making similar claims as Pantoja] go from being that guy to being a plaintiff? Was [Thomas] at the same picnic that [Pantoja's counsel] put on at Wyandotte County Lake, or was he at one of those union meetings that [Pantoja's counsel] came to where he was recruiting clients?
>
> "You see, folks, this case isn't about justice. This isn't about values. This is about a lawyer, a very smart one, who figured out a way to create a case, and went out and recruited clients, and then went to some doctors and told them the information that he wanted them to know so he could get the right opinions out of them, and then marched all of his other clients in here to help support his case.
>
> "It is like a game of lawsuit musical chairs. One is going to sit in the chair this week, and one is going to sit in that chair the next week, and they are all going to try to help each other win a case in front of jurors like you."

Pantoja's counsel did not contemporaneously object to these statements, nor did he request a curative jury instruction. Pantoja filed a motion for a new trial 24 days after the entry of judgement; one of the bases for that motion was BNSF's counsel's closing arguments.

It is well settled that, in a civil case, the absence of a contemporaneous objection and request for a curative instruction forecloses the availability of misconduct during closing arguments as a basis for reversing a judgment. See, *e.g.*, *Siler v. City of Kansas City*, 211 Kan. 258, 258, 505 P.2d 765 (1973); *Borggren v. Liebling*, 198 Kan. 161, 165, 422 P.2d 844 (1967). Only in very limited circumstances may statements in closing arguments be reviewable on appeal without a contemporaneous objection. However, such a review is only conducted when the challenged remarks involve

18

"repeated and material errors that permeate the whole trial and clearly result in prejudice such that appellate review is permissible in the interest of justice. Compare [*Smith v.*] *Blakey,* [*Administrator*], 213 Kan. [91,] 95-96, [515 P.2d 1062 (1973)] (improper comments by plaintiff's counsel not isolated but frequently repeated and permeated throughout the whole trial warranting departure from general rule that appellate court will not consider reversal in absence of contemporaneous objection) with *McKissick v. Frye*, 255 Kan. 566, 587, 876 P.2d 1371 (1994) (lack of objection during closing argument prevented review because challenged comment was not repeated and circumstances were not sufficiently similar to *Blakey*)." *Weber v. Farmers Ins. Co., Inc.*, No. 107,334, 2012 WL 6634413, at *10 (Kan. App. 2012) (unpublished opinion), *rev. denied* 297 Kan. 1257 (2013).

Here, BNSF's counsel's comments were not repeated, pervasive, or outrageous so as to preserve a challenge to the comments without a contemporaneous objection. Therefore, we find Pantoja has waived any challenge to counsel's remarks.

F.      *Cumulative error*

Finally, Pantoja argues that the jury's verdict should be reversed based on the cumulative effect of the errors alleged above. Cumulative error warrants reversal when the various errors "have so permeated and tainted the entire proceedings that [a party] has been deprived of the fair trial to which every litigant is entitled." *Walker*, 196 Kan. at 520. A single error cannot constitute cumulative error. *State v. Williams*, 299 Kan. 509, 566, 324 P.3d 1078 (2014). Because we have found no error, there can be no cumulative error.

Affirmed.